IN THE SUPREME COURT OF NORTH CAROLINA

No. 23A18

Filed 21 December 2018

STATE OF NORTH CAROLINA

v.

ANGELA MARIE RANKIN

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, ___ N.C. App. ___, 809 S.E.2d 358 (2018), vacating defendant's conviction upon appeal from a judgment entered on 6 July 2016 by Judge Michael D. Duncan in Superior Court, Guilford County. Heard in the Supreme Court on 27 August 2018.

*Joshua H. Stein, Attorney General, by Teresa M. Postell, Assistant Attorney General, for the State-appellant.*

*Sarah Holladay for defendant-appellee.*

BEASLEY, Justice.

In this case we consider whether the Court of Appeals erred in vacating defendant's conviction under N.C.G.S § 14-399(a) for felony littering upon concluding that the indictment failed to allege an essential element of the statutory crime and was fatally defective, thus depriving the trial court of jurisdiction over the accused. Because we conclude that the indictment was facially invalid, we affirm the decision of the Court of Appeals.

On 27 April 2014, defendant Angela Rankin located a large metal tank containing fuel oil near a residential driveway on North Elam Avenue in Greensboro, North Carolina. Defendant wanted to take the tank to sell it as scrap metal. When she tried to lift the tank into her vehicle, she discovered that the oil inside made it too heavy to maneuver. So that the tank "wouldn't be as heavy," defendant drained the fuel oil onto the ground and then left the scene with the metal tank. The tank was reported stolen to the City of Greensboro Police Department, and an investigation revealed that defendant had committed the theft.

On 21 July 2014, defendant was indicted for felony littering of hazardous waste, misdemeanor larceny, and misdemeanor conspiracy to commit larceny. On 5 July 2016, a jury trial was held in Superior Court, Guilford County. Defendant moved to dismiss all charges at the close of the evidence, and the trial court dismissed the conspiracy charge. The jury found defendant guilty of felony littering of hazardous waste and not guilty of misdemeanor larceny. The trial court sentenced defendant to five to fifteen months of imprisonment, suspended the sentence, and placed her on supervised probation for eighteen months.

Defendant appealed her conviction to the Court of Appeals, arguing that the trial court lacked jurisdiction because the indictment failed to allege an essential element of the crime of felony littering of hazardous waste. The Court of Appeals majority agreed and vacated the conviction. *State v. Rankin*, ___ N.C. App. ___, ___, 809 S.E.2d 358, 365 (2018). One judge dissented, asserting that the indictment was

facially valid because the statutory language omitted from the indictment is an affirmative defense, not an essential element of the crime. *Id.* at ___, 809 S.E.2d at 368 (Berger, J., dissenting). The State filed a notice of appeal with this Court based on the issues raised in the dissenting opinion.

"[A] valid bill of indictment is essential to the jurisdiction of the trial court to try an accused for a felony." *State v. Campbell*, 368 N.C. 83, 86, 772 S.E.2d 440, 443 (2015) (quoting *State v. Sturdivant,* 304 N.C. 293, 308, 283 S.E.2d 719, 729 (1981)). A valid indictment, among other things, serves to "identify the offense" being charged with certainty, to "enable the accused to prepare for trial," and to "enable the court, upon conviction, to pronounce the sentence." *State v. Saults*, 294 N.C. 722, 726, 242 S.E.2d 801, 805 (1978).

To be sufficient, an indictment must include, *inter alia*, "[a] plain and concise factual statement" asserting "facts supporting every element of a criminal offense and the defendant's commission thereof." N.C.G.S. § 15A-924(a)(5) (2017). If the indictment fails to state an essential element of the offense, any resulting conviction must be vacated. *See, e.g.*, *Campbell*, 368 N.C. at 86, 772 S.E.2d at 443; *see also State v. Wagner*, 356 N.C. 599, 601, 572 S.E.2d 777, 779 (2002) (per curiam). The law disfavors application of rigid and technical rules to indictments; so long as an indictment adequately expresses the charge against the defendant, it will not be quashed. *See Sturdivant*, 304 N.C. at 311, 283 S.E.2d at 731. For example, in *State v. Mostafavi* the defendant argued that the indictment charging him with obtaining

property by false pretenses omitted an essential element of the crime because it failed to allege the precise amount of money the defendant received when he pawned the property obtained. 370 N.C. 681, 683, 811 S.E.2d 138, 140 (2018). This Court held that the indictment was facially valid because it clearly identified "the conduct which [was] the subject of the accusation" by alleging that the defendant received United States currency by pawning stolen property as if it were his own. *Id.* at 687, 811 S.E.2d at 142 (quoting N.C.G.S. § 15A-924(a)(5) (2017)).

But an indictment will be quashed "when an indispensable allegation of the charge is omitted." *State v. Russell*, 282 N.C. 240, 245, 192 S.E.2d 294, 297 (1972) (citations omitted). For example, in *State v. Murrell* the defendant challenged an indictment charging him with robbery with a dangerous weapon, arguing that an essential element of the crime—presence of a dangerous weapon—was not alleged. 370 N.C. 187, 190-91, 804 S.E.2d 504, 506-07 (2017). We noted that "the possession, use, or threatened use of firearms, or other dangerous weapon, implement, or means" was an essential element of the offense. *Id.* at 194, 804 S.E.2d at 509 (footnote omitted). Furthermore, this Court found the indictment facially invalid, observing that "an allegation that it 'reasonably appear[ed] . . . that a dangerous weapon was in the defendant's possession' is simply not equivalent to an allegation that defendant actually possessed a weapon." *Id.* at 196, 804 S.E.2d at 510 (alterations in original).

Likewise, when an indictment charges a defendant with a statutory offense, the document must allege all the essential elements of the offense. *Id.* at 193, 804

S.E.2d at 508 (citations omitted). If the words of a statute do not "set forth all the essential elements of the specified act intended to be punished, such elements must be charged in the bill [of indictment]." *State v. Greer*, 238 N.C. 325, 329, 77 S.E.2d 917, 920 (1953) (quoting *State v. Cole*, 202 N.C. 592, 597, 163 S.E. 594, 597 (1932)); *see also, e.g.*, *State v. Hunter*, 299 N.C. 29, 41, 261 S.E.2d 189, 197 (1980) (stating that although an indictment need not track the language of the statute completely, an indictment charging the violation of a statute in general terms only can be insufficient to confer jurisdiction on the trial court); *State v. Cook*, 272 N.C. 728, 158 S.E.2d 820 (1968) (holding that the language of a warrant for driving while license revoked, which referred to a statutory provision with intent to charge the offense therein, was facially invalid for failing to allege an essential element: that the defendant drove on a public highway).

The indictment in this case charged that defendant:

> unlawfully, willfully and feloniously did intentionally and recklessly spill and dispose of litter on property not owned by the defendant, the property owned and controlled by the City of Greensboro and not into a litter receptacle as defined in General Statute 14-399(A)(2). The litter discarded was hazardous waste.

The statute at issue here states:

> (a) No person, including any firm, organization, private corporation, or governing body, agents or employees of any municipal corporation shall intentionally or recklessly throw, scatter, spill or place or intentionally or recklessly cause to be blown, scattered, spilled, thrown or placed or otherwise dispose of any litter upon any public

property or private property not owned by the person within this State or in the waters of this State including any public highway, public park, lake, river, ocean, beach, campground, forestland, recreational area, trailer park, highway, road, street or alley except:

(1) When the property is designated by the State or political subdivision thereof for the disposal of garbage and refuse, and the person is authorized to use the property for this purpose; or

(2) Into a litter receptacle in a manner that the litter will be prevented from being carried away or deposited by the elements upon any part of the private or public property or waters.

N.C.G.S § 14-399(a) (2017 & Supp. 2018). The indictment indisputably failed to allege facts satisfying subdivision (a)(1). The ultimate question before us is whether such facts are required; that is, whether subdivision (a)(1) sets out an affirmative defense or an essential element of felony littering. The former need not be alleged in a valid indictment, while the latter must be. Because the language of the statute does not explicitly resolve this issue, we turn to the well-established tenets of statutory interpretation.

The goal of statutory interpretation is to determine the meaning that the legislature intended upon the statute's enactment. *See State v. Beck*, 359 N.C. 611, 614, 614 S.E.2d 274, 276-77 (2005) (citations omitted). Therefore, we must construe the statute while mindful of the criminal conduct that the legislature intends to prohibit. *In re Banks*, 295 N.C. 236, 244 S.E.2d 386 (1978). "The intent of the General Assembly may be found first from the plain language of the statute, then from the

legislative history, the spirit of the act and what the act seeks to accomplish.*" State v. Langley*, ___ N.C. ___, ___, 817 S.E.2d 191, 196 (2018) (quoting *Midrex Techs., Inc. v. N.C. Dep't of Revenue*, 369 N.C. 250, 258, 794 S.E.2d 785, 792 (2016)). "The Court will not adopt an interpretation which result[s] in injustice when the statute may reasonably be otherwise consistently construed with the intent of the act." *Nationwide Mut. Ins. Co. v. Mabe*, 342 N.C. 482, 494, 467 S.E.2d 34, 41 (1996) (quoting *Sutton v. Aetna Cas. & Sur. Co.*, 325 N.C. 259, 265, 382 S.E.2d 759, 763 (1989)).

When the General Assembly uses an "unambiguous word without providing an explicit statutory definition, that word will be accorded its plain meaning." *Fidelity Bank v. N.C. Dep't of Revenue*, 370 N.C. 10, 19, 803 S.E.2d 142, 149 (2017) (citations omitted). However, if a literal interpretation of a word or phrase's plain meaning will lead to "absurd results, or contravene the manifest purpose of the Legislature, as otherwise expressed, the reason and purpose of the law shall control." *Beck*, 359 N.C. at 614, 614 S.E.2d at 277 (quoting *Mazda Motors of Am., Inc. v. Sw. Motors, Inc.*, 296 N.C. 357, 361, 250 S.E.2d 250, 253 (1979)). "Parts of the same statute dealing with the same subject matter must be considered and interpreted as a whole." *State ex rel. Comm'r of Ins. v. N.C. Auto. Rate Admin. Office*, 294 N.C. 60, 66, 241 S.E.2d 324, 328 (1978) (citations omitted).

An indictment need not include affirmative defenses to statutory crimes in order to be sufficient. *See Sturdivant*, 304 N.C. at 310, 283 S.E.2d at 731 ("[A]n

indictment need not negate a defense to the stated crime; rather, it is left to the defendant to show his defenses at trial."). The characteristics of an affirmative defense are further defined in *State v. Sanders*, in which we stated that "[w]hen [a] defendant relies upon some independent, distinct, substantive matter of exemption, immunity or defense, *beyond the essentials of the legal definition of the offense itself*, the onus of proof as to such matter is upon the defendant." 280 N.C. 81, 85, 185 S.E.2d 158, 161 (1971) (emphasis added) (quoting *State v. Johnson*, 229 N.C. 701, 706, 51 S.E.2d 186, 190 (1949)). Furthermore, "[a]llegations beyond the essential elements of the crime sought to be charged are irrelevant and may be treated as surplusage" and thus should not be included in an indictment. *State v. Birdsong*, 325 N.C. 418, 422, 384 S.E.2d 5, 7 (1989) (quoting *State v. Taylor,* 280 N.C. 273, 276, 185 S.E.2d 677, 680 (1972)).

Whether an exception to a statutorily defined crime is an essential element of that crime or an affirmative defense to it depends on whether the statement of the offense is complete and definite without inclusion of the language at issue. *See State v. Dobbins*, 277 N.C. 484, 502, 178 S.E.2d 449, 460 (1971) (citations omitted). The criminal conduct that the statute seeks to prohibit here is the depositing of litter in unauthorized locations by unauthorized persons. N.C.G.S. § 14-399(a) (prohibiting persons and entities from intentionally or recklessly throwing, scattering, or spilling any litter upon any public or private property within this state). Therefore, in addition to the required language of subdivision (a), the offense of littering is not

complete unless it excludes authorized locations and persons from its definition. *See Dobbins*, 277 N.C. at 502, 178 S.E.2d at 460. Subdivision (a)(1) does just that. Therefore, we hold that to be valid, the indictment charging felony littering must allege that the accused is an unauthorized person who deposited refuse on property not designated for such activity.

In the dissent's view, this Court should categorize subdivision (a)(1) as either an exception or qualification without regard to whether (a)(1) is a part of the complete legal definition of littering. This is because, according to the dissent, N.C.G.S. § 14-399(a) "creates criminal liability to redress the societal ill of littering." Using this standard, the dissent concludes that subsection (a) of N.C.G.S. § 14-399 contains a complete and definite description of littering, and the only matter left to decide is what kind of proviso subdivision (a)(1) is as these are described in *State v. Norman*, 13 N.C. (2 Dev.) 222, 226 (1829). *Norman* described two kinds of provisos, one "which withdraws the case provided for from the operation of the act" and "the other adding a qualification, whereby a case is brought within that operation." *Id.* at 226.

This view is problematic for two reasons. First, it contradicts well-established binding precedent from this Court holding that the complete and definite description of a crime is one in which each essential element necessary to constitute that crime is included. *Johnson*, 229 N.C. at 706, 51 S.E.2d at 190 (observing that the State carries the burden of establishing the "essentials of the legal definition of the offense itself"); *State v. Edwards*, 190 N.C. 322, 324, 130 S.E. 10, 11 (1925) ("[I]n indictments

on a statute the essential words descriptive of the offense or their just equivalent must be given . . . " (quoting *State v. Mooney*, 173 N.C. 798, 800, 92 S.E. 610, 611 (1917))); *see also* N.C.G.S. § 15A-924(a)(5) ("A criminal pleading must contain . . . facts supporting every element of a criminal offense."). Furthermore, framing the issue in this narrow manner—whether subdivision (a)(1) is an exception or qualification—impermissibly limits the scope of the statutory interpretation and construction in which this Court was prompted to engage by the Court of Appeals' dissent: whether (a)(1) is an essential element or an exception to the crime of littering.

Even if we considered subdivision (a)(1) to be a proviso, that would not end our inquiry into whether it is an essential element of littering. In *State v. Connor* we observed that a proviso can be so "mixed up with the description of the offense" that it comprises an essential part of the statement of the crime. 142 N.C. 700, 704, 55 S.E. 787, 789 (1906). We hold that subdivision (a)(1) is so intertwined with the description of the offense of littering that it forms an essential element of the crime. As discussed further below, to hold otherwise would result in an absurdity. Likewise, concluding that subdivision (a)(1) is an exception, meaning it "withdraws the case provided for from the operation of the act," *Norman*, 13 N.C. (2 Dev) at 226, would necessitate the conclusion that the authorized persons described in (a)(1) are engaging in a form of "authorized littering" which by statutory definition is legally impossible because littering is the depositing of litter in unauthorized locations by unauthorized persons. Subdivision (a)(1) is a part of the definition of littering in that

it describes the opposite of littering: authorized persons depositing refuse in authorized locations. In sum, subsection (a) describes what littering is, while subdivision (a)(1) describes what it is not. Finally, subdivision (a)(1) could not be a qualification, because it does not bring a case within the operation of the act.

Additionally, in *Connor*, immediately after stating the test for when a proviso may be omitted from an indictment, this Court emphasized:

> The test here suggested, however, is not universally sufficient, and a careful examination of the principle will disclose that the rule and its application depends not so much on the placing of the qualifying words, or whether they are preceded by the terms, "provided" or "except;" but rather on the nature, meaning and purpose of the words themselves.
> And if these words, though in the form of a proviso or an exception, are in fact, and by correct interpretation, but a part of the definition and description of the offense, they must be negatived in the bill of indictment.
> In such case, this is necessary, in order to make a complete statement of the crime for which defendant is prosecuted.

142 N.C. at 702, 55 S.E. at 788. In other words, the Court's primary task is to interpret the statutory language—its nature, meaning and purpose—to decide whether subdivision (a)(1) is an essential element of the crime of littering. No formulaic rule statement can replace the holistic inquiry required by statutory interpretation and construction.

The Court of Appeals dissent proffers that the language of the statute preceding the word "except" is the complete legal definition of the crime because that

language essentially encompasses the literal meaning of the phrase "to litter"—"to scatter about carelessly"—and criminalizes that act while withdrawing persons authorized by subdivision (a)(1) from criminal liability for littering. *Rankin*, ___ N.C. App. at ___, 809 S.E.2d at 366 (quoting *Litter, Webster's New World College Dictionary* (5th ed. 2014)). Nonetheless, the plain meaning of a phrase will apply only if an unambiguous term is actually *used* and not defined in the statute. *See Fidelity Bank*, 370 N.C. at 19, 803 S.E.2d at 149 ("In the event that the General Assembly *uses* an unambiguous word without providing an explicit statutory definition, that word will be accorded its plain meaning." (emphasis added)) "To litter" does not appear in this statute, and while the language of the statute may encompass the literal meaning of the phrase "to litter," the legal definition extends beyond that phrase as evidenced by the surrounding language.[1]  *See* N.C.G.S. § 14-399(a) (prohibiting intentional or

---

[1] While the phrase 'to litter' does not appear in this statute, the word 'litter' is statutorily defined:

> any garbage, rubbish, trash, refuse, can, bottle, box, container, wrapper, paper, paper product, tire, appliance, mechanical equipment or part, building or construction material, tool, machinery, wood, motor vehicle or motor vehicle part, vessel, aircraft, farm machinery or equipment, sludge from a waste treatment facility, water supply treatment plant, or air pollution control facility, dead animal, or discarded material in any form resulting from domestic, industrial, commercial, mining, agricultural, or governmental operations. While being used for or distributed in accordance with their intended uses, "litter" does not include political pamphlets, handbills, religious tracts, newspapers, and other similar printed materials the unsolicited distribution of which is protected by the Constitution of the United States or the Constitution of North Carolina.

reckless throwing, spilling, and placing, in addition to carelessly scattering, litter); *see also N.C. Auto. Rate Admin. Office*, 294 N.C. at 66, 241 S.E.2d at 328 (instructing that related parts of a statute must be interpreted as a whole).

Moreover, N.C.G.S. § 14-399(a) must be read to incorporate subdivision (a)(1) as part of the legal definition of the crime to prevent absurd results. As noted by the Court of Appeals majority, "a trash collector disposing of waste in a city dump could be charged with littering and then have the burden of showing that his actions fell within an 'exception' to the littering statute." *Rankin*, ___ N.C. App. at ___, 809 S.E.2d at 364-65 (majority opinion). If the General Assembly wanted to enable a trash collector to be criminally charged for doing his or her job and forced to demonstrate his or her innocence by proving an affirmative defense at trial, it could have indicated as much in the statute.[2] Construing this statute accordingly and applying widely accepted principles of statutory interpretation, while avoiding

---

N.C.G.S. § 14-399(i)(4) (2017 & Supp. 2018).

[2] The Court of Appeals also discussed *State v. Hinkle*, 189 N.C. App. 762, 659 S.E.2d 34 (2008), wherein the Court of Appeals held that subdivision (a)(2) of N.C.G.S. § 14-399(a) constituted an essential element of littering. In that case the Court of Appeals applied the absurdity doctrine, opining that "[w]ithout the 'except . . . [i]nto a litter receptacle' language, placing a broken rubber band into a trash can at our Court would be littering." *Hinkle*, 189 N.C. App. at 769, 659 S.E.2d at 38 (second and third alterations in original). It is significant that in the ten years since *Hinkle* was decided, the legislature has not revised N.C.G.S. § 14-399 to contradict this holding. In *Rankin*, the Court of Appeals concluded that "[b]ecause subsections (a)(1) and (a)(2) serve identical purposes in this statute, it would be illogical to suggest that one is an essential element but the other is not." *Rankin*, ___ N.C. App. at ___, 809 S.E.2d at 363.

absurd results, compels the conclusion that the crime of littering has not occurred at all if the actor is a waste management professional disposing of garbage at a landfill.[3] *See State v. Jones*, 367 N.C. 299, 306, 758 S.E.2d 345, 350 (2014) (applying the tenet that if "a literal interpretation of the language of a statute will lead to absurd results . . . the reason and purpose of the law shall control and the strict letter thereof shall be disregarded" (quoting *Beck*, 359 N.C. at 614, 614 S.E.2d at 277)).

The dissent opines that the absurdity doctrine is erroneously applied in our analysis here because it "applies to the act of *interpreting* a statute—to determining the statute's meaning" whereas this dispute "is about how to *classify* the proviso in [subdivision] (a)(1), not how to interpret it." However, as previously discussed, classifying the language in subdivision (a)(1) as an essential element or an exception to the crime of littering *is* a matter of statutory interpretation. The role of the absurdity doctrine in this process is to provide a means to test the implications of a proposed interpretation of the statute against legislative intent. We must consider the possible results of our interpretation to determine whether that interpretation

---

[3] By way of analogy, the crime of assault on a female requires that the victim be a female and the accused a male who is at least eighteen years of age. N.C.G.S. § 14-33(c)(2) (2017 & Supp. 2018); *State v. Herring*, 322 N.C. 733, 743, 370 S.E.2d 363, 370 (1988) ("The elements of assault on a female are (1) an assault, (2) upon a female person, (3) by a male person (4) who is at least eighteen years old."). Therefore, the crime has not occurred if the victim is not a female, or if the accused is under eighteen or is not a male. Likewise here, the crime of littering has not occurred if the accused is a sanitation worker disposing of waste at an authorized location. Just as it would be absurd to assert that a female charged with assault on a female must plead her gender as an affirmative defensive, it is equally unfair to burden a sanitation worker with the task of establishing his or her authorization to dispose of waste.

aligns with the intent of the legislature as evidenced by the history, context, goals, and spirit of the law.

We applied the absurdity doctrine thusly in *State v. Jones* and concluded that a strict construction of the statute would have allowed "individuals to escape criminal liability [for identity theft] simply by stating or signing a name that differ[ed] from the cardholder's name," a result we determined could not have been within the intent of the legislature when adopting the statute criminalizing identity fraud.  367 N.C. at 306, 758 S.E.2d at 350  (citing *Beck*, 359 N.C. at 614, 614 S.E.2d at 277).  Likewise, if we *interpret* subdivision (a)(1) to be an exception to, rather than an essential element of, littering, an absurdity will result.  Exposing a faulty interpretation of the statute, far from distorting the issue, is a necessary analytical exercise in resolving this case.

We conclude that subdivision (a)(1), which requires that the accused be an unauthorized person depositing refuse on land not designated by the State for such use, is an essential element of the crime of felony littering,  however, we acknowledge the legislature's power to determine otherwise.[4]  The State has conceded that the

---

[4] It is notable that the General Assembly has, in other circumstances, expressly treated certain facts as constituting affirmative defenses.  *See, e.g.*, N.C.G.S. § 15A-905(c) (2017) (describing the procedure required to give notice when the accused anticipates raising any one of various affirmative defenses: alibi, duress, entrapment, insanity, mental infirmity, diminished capacity, self-defense, accident, automatism, involuntary intoxication, or voluntary intoxication).  In the context of criminal littering statutes, several legislatures in other states have created clear distinctions between an affirmative defense to the crime of littering and essential elements of the crime.  *See, e.g.*, Cal. Penal Code § 374(a) (West 2018)

indictment upon which defendant was convicted failed to allege the portion of the definition of littering contained in subdivision (a)(1). To sufficiently give notice to a defendant and allow her to prepare a defense, an indictment must include "[a] plain and concise factual statement" that "asserts facts supporting every element of a criminal offense and the defendant's commission thereof." N.C.G.S. § 15A-924(a)(5). The indictment in this case failed to allege each element of the crime of littering, thereby depriving defendant of sufficient notice. Because the indictment failed to sufficiently allege all indispensable, essential elements of the offense, it was facially invalid and the trial court had no jurisdiction to enter a conviction on the charge against defendant. Accordingly, we affirm the Court of Appeals' decision to vacate defendant's conviction for felony littering of hazardous waste.

A significant portion of the dissenting opinion is devoted to the idea that the Criminal Procedure Act that took effect in July 1975 abrogated the common law rule that a defective indictment deprives a criminal court of jurisdiction. Not only is discussion of this issue outside the scope of review applicable to this case, but statutory interpretation reveals that the legislature intentionally left the common

("Littering means the willful or negligent throwing, dropping, placing, depositing, or sweeping, or causing any such acts, of any waste matter on land or water *in other than appropriate storage containers or areas designated for such purposes.*" (emphasis added)); Colo. Rev. Stat. Ann. § 18-4-511(2)(a) (West 2018) ("It shall be an affirmative defense [to littering] that: Such property is an area designated by law for the disposal of such material and the person is authorized by the proper public authority to so use the property . . . ."); Fla. Stat. § 403.413(6)(h) (2018) ("[T]he state does not have the burden of proving that the person did not have the right or authority to dump the litter. The defendant has the burden of proving that he or she had authority to dump the litter . . . .").

law remedy for invalid indictments intact when it enacted comprehensive revisions to the Criminal Procedure Act.

This case is before this Court based on a dissent in the Court of Appeals. *See* N.C.G.S. § 7A-30(2) (2017). Thus, the scope of review is "limited to those questions on which there was division in the intermediate appellate court," *C.C. Walker Grading & Hauling, Inc. v. S.R.F. Mgmt. Corp.*, 311 N.C. 170, 175, 316 S.E.2d 298, 301 (1984) (discussing N.C. R. App. P. 16 (1984)), and this Court's review is "properly limited to the single issue addressed in the [Court of Appeals] dissent," *Blumenthal v. Lynch*, 315 N.C. 571, 577, 340 S.E.2d 358, 361 (1986). In their briefs to this Court, respectively, neither party asked this Court to address the remedy flowing from an invalid indictment, and had they attempted to do so, their effort would likely have been rejected. *Id.* at 577-78, 340 S.E.2d at 361-62 ("[W]e strongly disapprove of and discourage attempts by appellate counsel to bring additional issues before this Court without its appropriate order allowing counsel's motion to allow review of additional issues."). Absent exceptional circumstances,[5] it is vital that we adhere to the procedural rules as they are enforced against litigants by this Court. Moreover, deciding this issue in the procedural context of this case deprives both parties of their

---

[5] "Where "issues of importance which are frequently presented to state agencies and the courts require a decision in the public interest," this Court will invoke Rule 2 of the North Carolina Rules of Appellate Procedure to address those issues. *Blumenthal*, 315 N.C. at 578, 340 S.E.2d at 362. However, whether the Criminal Procedure Act abrogated the common law remedy for invalid indictments is not a question frequently presented to state agencies or courts, so the invocation of Rule 2 would be inappropriate in this case.

opportunity to be heard with respect to this issue. Nonetheless, given that the dissent here has discussed the effect of the Criminal Procedure Act on the common law remedy for invalid indictments, we will briefly address the issue.

In the absence of a contrary decision by the General Assembly, the common law remains in effect in North Carolina. N.C.G.S. § 4-1. Whether a particular statute supplants a common law remedy is a question of statutory interpretation. *See, e.g.*, *Quick v. United Benefit Life Ins. Co.*, 287 N.C. 47, 54-56, 213 S.E.2d 563, 568-69 (1975) (applying tenets of statutory interpretation to determine whether N.C.G.S. § 31A-15 supplanted the common law principle prohibiting a person from profiting from his or her wrongdoing); *Orange County. v. Heath*, 282 N.C. 292, 296-97, 192 S.E.2d 308, 310-11 (1972) (using principles of statutory interpretation to determine whether N.C.G.S. § 1A-1, Rule 65 abrogated the common law rule of governmental immunity for municipalities). Therefore, the previously stated rules that guide statutory interpretation are applicable, as well as rules relating to statutory abrogation of common law.

In determining legislative intent, we must consider the history of the statute and the reason for its enactment. *See Black v. Littlejohn*, 312 N.C. 626, 630, 325 S.E.2d 469, 473 (1985). "It is always presumed that the legislature acted with care and deliberation and with full knowledge of prior and existing law." *State v. Benton*, 276 N.C. 641, 658, 174 S.E.2d 793, 804 (1970). Furthermore, in the quest to interpret

a statute, courts will not presume that the legislature intended to repeal a law by implication. *Id.* at 658, 174 S.E.2d at 604.

The dissent explores the history and context behind the enactment of the Criminal Procedure Act, including an in-depth report prepared for the legislature by a special committee proceeding adoption of the Act. *Legislative Program and Report to the General Assembly of North Carolina by the Criminal Code Commission* (1973). The documented history of the purpose and function of indictments along with the legislature's efforts to assess the impact of the previous enactment of the criminal code provide ample evidence that the legislature was well aware of the common law remedy for invalid indictments. Still, there are no provisions that contradict or abrogate this remedy. The absence of such provisions demonstrates that the General Assembly did not intend to change the common law discussed in the dissent.

The provisions related to indictments in the Act, codified in the North Carolina General Statutes at chapter 15A, evidence the legislature's intent to preserve the common law rule that an indictment is required to invoke the court's jurisdiction in felony cases. Article 32 mandates that for felony charges "prosecutions originating in the superior court *must* be upon pleadings. " N.C.G.S. § 15A-642(a) (emphasis added), and that the appropriate pleading for a felony charge is an indictment. N.C.G.S. § 15A-923(a). Further, the remedy for a facially invalid indictment is thus: "Upon motion of a defendant under G.S. 15A-952(b) the court *must* dismiss the

charges contained in a pleading which fails to charge the defendant with a crime[6] in a manner required by subsection (a) . . . " N.C.G.S. § 15A-924(e) (emphasis added). In other words, pursuant to the Act, the court cannot continue criminal prosecution if the indictment fails to charge the defendant with a crime. These provisions represent the statutory adoption of the common law rule that a valid indictment is required for a court to retain jurisdiction to prosecute a felony charge, as well as the common law remedy for lack of jurisdiction—dismissal.

Any assertion that the legislature implicitly abrogated the common law rule by enacting the Criminal Procedure Act would be unjustified in light of the legislature's initial comprehensive reform of the Act and the detailed commentary included with the codified statutes. The Criminal Code Commission's proposal emerged after a total of thirty-eight meeting days, in which it "carefully considered the best of North Carolina practice" before submitting final recommendations. *Legislative Program and Report to the General Assembly of North Carolina by the Criminal Code Commission* at i-ii (1973).

The General Assembly acknowledged and approved of the common law remedy for invalid indictments with the enactment of the revised Criminal Procedure

---

[6] Although the dissent interprets N.C.G.S. § 15A-954(a) to preclude trial judges from dismissing fatally defective indictments on their own motion, nothing in the statutory language limits their authority to situations in which the defendant makes a dismissal motion. In addition, the fact that the General Assembly has adopted short form indictments for certain offenses does not undercut the validity of the common law rule, given that the same lack of jurisdiction exists when an indictment fails to comply with the statutory requirements for such pleadings.

Act.  The official commentary accompanying N.C.G.S. § 15A-924 states in part: "The pleading rule, requiring factual (but not evidentiary) allegations to support each element, is in accord with our traditional ideas and provides a concise statutory statement."  N.C.G.S. § 15A-924 official cmt. (citing *Greer*, 238 N.C. 325, 77 S.E.2d 917).  In *Greer* we held that an indictment is facially invalid when it omits any essential elements of the crime to be charged.  *Id.*  As a result of the defective indictment, the Court in *Greer* applied the common law remedy for defective indictments.  *Id.*  The official commentary referencing *Greer* demonstrates that the legislature explicitly endorsed the common law rules for indictments as stated in that case, including the common law remedy for invalid indictments.  *See Greer*, 238 N.C. at 332, 77 S.E.2d at 922.  Furthermore, in the decades since the enactment of the revised Criminal Procedure Act, the common law remedy for invalid indictments has been applied time and again by the appellate courts.  *See, e.g., State v. Simpson*, 302 N.C. 613, 616,  276 S.E.2d 361, 363 (1981) ("[A] valid bill of indictment is essential to the jurisdiction of the court to try defendant for a felony."); *State v. Mostafavi*, 370 N.C. 681, 684, 811 S.E.2d 138, 141 (2017) (observing that "a valid bill of indictment is essential to the jurisdiction of the trial court to try an accused for a felony" (quoting *Sturdivant,* 304 N.C. at 308, 283 S.E.2d at 729)).  The General Assembly, no doubt aware of this practice, has never acted to abrogate this common law rule, although it does retain the right to do so for policy-related reasons.  There is no unsettled question

of whether the common law remedy for invalid indictments was abrogated by the Criminal Procedure Act.

We conclude that subdivision (a)(1), which requires that the accused be an unauthorized person depositing refuse on land not designated by the State for such use, is an essential element of the crime of felony littering.  Accordingly, we affirm the holding of the Court of Appeals.


AFFIRMED.

Chief Justice MARTIN dissenting.

I write separately to discuss the significant failings of the jurisdictional approach the majority uses to evaluate the sufficiency of criminal indictments. Taking my cue from *United States v. Cotton*, 535 U.S. 625, 122 S. Ct. 1781 (2002), the time has come to reconsider this antiquated approach to flawed indictments in light of the extensive statutory, constitutional, and conceptual changes in criminal procedure during the twentieth century. Moreover, the General Assembly may wish to consider revisions to our criminal code to lessen the detrimental impact of the common law jurisdictional approach on the administration of justice in North Carolina.

In addition to my concerns about the common law jurisdictional rule, I also write separately because the majority creates (under the guise of interpretation) its own criminal offense and fails to grapple with or apply our precedents on the classification of criminal statutory provisos. And, in so doing, the majority creates significant uncertainty by failing to establish a discernible method to assist lower courts and prosecutors in distinguishing between elements and defenses.

# I

A valid indictment must comply with requirements of form and substance, *see* N.C.G.S. §§ 15A-644(a), -924(a) (2017), including the statutory requirement that an indictment contain facts supporting every element of the charged offense, *id.* § 15A-924(a)(5).

The State indicted defendant for felony littering under N.C.G.S. § 14-399.  In relevant part, that statute provides:

> (a) No person . . . shall intentionally or recklessly throw, scatter, spill or place . . . or otherwise dispose of any litter upon any public property or private property not owned by the person within this State or in the waters of this State . . . except:
>
>> (1)  When the property is designated by the State or political subdivision thereof for the disposal of garbage and refuse, and the person is authorized to use the property for this purpose . . . .
>
>  . . . .
>
> (e) Any person who violates subsection (a) of this section in an amount exceeding 500 pounds or in any quantity for commercial purposes, or who discards litter that is a hazardous waste . . . is guilty of a Class I felony.

*Id.* § 14-399 (2017).  According to the majority, the merits of this case hinge on whether the proviso in subdivision (a)(1) is an element of felony littering or an affirmative defense.

In deciding this issue, we are confronted with a two-part inquiry.  First, the Court must ask whether, omitting the proviso, the primary provision in the statute states a "complete and definite" description of the crime.  *State v. Dobbins*, 277 N.C. 484, 502, 178 S.E.2d 449, 460 (1971) (quoting *State v. Connor*, 142 N.C. 700, 701, 55 S.E. 787, 788 (1906)).  If it does not, then any proviso that completes the description must be included in the indictment.  *See id.* (quoting *Connor*, 142 N.C. at 701, 55 S.E.

-2-

at 788).  Alternatively, if the primary provision *does* state a complete and definite description of the crime, then our next task is to classify the proviso as either an exception or a qualification.  *Connor*, 142 N.C. at 701-02, 55 S.E. at 788-89; *see also State v. Norman*, 13 N.C. (2 Dev.) 222, 226 (1829) (describing the two kinds of provisos).  This distinction—used by this Court since at least 1829—is fairly straightforward: exceptions remove certain cases from the operation of the statute, while qualifications bring a case within the operation of the statute.  *Norman*, 13 N.C. (2 Dev.) at 226.  An exception does not need to be negated in the indictment; the onus is on the defendant to raise the exception as a defense.  *Id.*  But if the proviso is a qualification, "the indictment must bring the case within the proviso."  *Id.*

In *State v. Moore*, for example, this Court considered an indictment for the illegal sale of intoxicating liquors.  The relevant statute provided "[t]hat it shall be unlawful for any person . . . *other than druggists and medical depositaries* [sic] *duly licensed thereto*, to engage in the business of selling, exchanging, bartering, giving away for the purpose of direct or indirect gain, or otherwise handling spirituous, vinous or malt liquors."  166 N.C. 284, 285-86, 81 S.E. 294, 295 (1914) (emphasis added) (quoting Act of Mar. 3, 1913, ch. 44, sec. 1, 1913 N.C. Pub. [Sess.] Laws 76, 76-77).  The defendant challenged the sufficiency of the charging warrant[1] because it

---

[1] The defendant was charged by use of a warrant rather than an indictment because the charged crime was a misdemeanor.  *See Moore*, 166 N.C. at 286, 81 S.E. at 295.  This distinction does not affect the analysis of whether a proviso is an exception or a qualification

failed to allege that he was not a druggist or a medical depository. *Id.* at 286, 81 S.E. at 295. But this Court rejected that challenge because "the exception in the statute is no part of the definition or description of the offense, but simply withdraws certain persons from its operation." *Id.* at 288, 81 S.E. at 296.

Before we determine whether the primary provision of the statute states a "complete and definite" description of a crime, we must bear in mind the respective roles of the legislative and judicial branches. The General Assembly, as the lawmaking arm of the people, has the power to define criminal activity. *See* N.C. Const. art. II, § 1; *State v. Hill*, 272 N.C. 439, 443, 158 S.E.2d 329, 332 (1968) ("It is the General Assembly which is to define crimes and ordain their punishment." (quoting *State v. Whitehurst*, 212 N.C. 300, 303, 193 S.E. 657, 660 (1937))). The courts, on the other hand, have the power to interpret the laws passed by the General Assembly and to determine whether these laws, either facially or as applied, violate the constitution. *See* N.C. Const. art. IV, § 1; *Bayard v. Singleton*, 1 N.C. (Mart.) 5, 6-7 (1787).

Here, the statute's primary provision states that "[n]o person . . . shall intentionally or recklessly throw, scatter, spill or place . . . any litter upon any public property or private property not owned by the person." N.C.G.S. § 14-399(a). This

---

for the purpose of a charging instrument, though. *See id.* at 288-89, 81 S.E. at 296 (stating that "[c]riminal accusations, *whether in the form of warrants or indictments*, must" meet certain requirements (emphasis added)).

provision creates criminal liability to redress the societal ill of littering. It defines the required culpability—intent or recklessness. It is, therefore, a complete and definite statement of a crime: no person may intentionally or recklessly throw or spill litter on any public property or on private property that he or she does not own.

But the majority today usurps the role of the General Assembly by summarily declaring—as part of a so-called "holistic inquiry"—that the crime of littering "is not complete unless it excludes authorized locations and persons from its definition." In other words, the majority declares that the crime of littering must, by definition, be committed without privilege or consent to be a crime. But this conclusion not only arrogates to this Court a power that is properly left in the General Assembly's hands; it also causes the majority's reasoning to collapse under the weight of past precedent. This Court has, on more than one occasion, stated that

> [t]hough the general rule is, that a proviso contained in the same section of the law . . . in which the defence is defined, must be negatived [in the indictment], yet where the charge itself is of such a nature that the formal statement of it is equivalent in meaning to such negative averment, *there is no reason for adhering to the rule*, and such a case constitutes an exception to it.

*State v. Sturdivant*, 304 N.C. 293, 310, 283 S.E.2d 719, 730-31 (1981) (ellipsis in original) (emphasis added) (quoting *State v. Bryant*, 111 N.C. 693, 694, 16 S.E. 326, 326 (1892)). Stated differently, if the crime, by its very nature, must be committed without privilege or consent, then the indictment does not need to negate privilege or consent. It follows that if the majority's characterization of the crime of littering is

correct—that a person can litter only if he or she does so without privilege or consent—then it is unnecessary to specifically assert the lack of privilege or consent in the indictment.

Because subsection (a) is a complete and definite description of the crime, the appropriate next step for this Court is to determine whether subdivision (a)(1) is an exception or a qualification to subsection (a). And, when analyzed under our long-standing precedent, subdivision (a)(1) is unquestionably an exception.

Once again, this analysis is straightforward: does the proviso subtract from the crime described in subsection (a), or does it bring additional cases within its operation? *See Norman*, 13 N.C. (2 Dev.) at 226. Subsection (a) prohibits disposing of litter on public property or private property belonging to another person. N.C.G.S. § 14-399(a). But subdivision (a)(1) allows disposal of litter on land "designated . . . for the disposal of garbage and refuse" by persons "authorized to use the property for [that] purpose." *Id.* § 14-399(a)(1). This proviso removes a specific act (disposing of litter on land designated for that purpose) committed by a specific class of persons (persons authorized to use that land) from the general definition in subsection (a). It is therefore an "exception in the statute [that] is no part of the definition or description of the offense." *Moore*, 166 N.C. at 288, 81 S.E. at 296. Accordingly, subdivision (a)(1) need not be alleged in the indictment.

By contrast, subsection (e) provides a qualification. For the conduct described

in subsection (a) to be a felony, the litter must be hazardous waste, litter "in an amount exceeding 500 pounds," or litter "in any quantity for commercial purposes." N.C.G.S. § 14-399(e). This proviso qualifies the offense described in subsection (a), and an indictment that tracks only the language of subsection (a) would not support a conviction for felony littering. Thus, a felony littering indictment must include the qualification in subsection (e). In this case, the indictment did so, asserting that "[t]he litter discarded was hazardous waste," which "br[ought] the case within the proviso." *Norman*, 13 N.C. (2 Dev.) at 226.

The majority opinion objects to the classification of subdivision (a)(1) as an exception, raising the Court of Appeals' example of a sanitation worker being "criminally charged for doing his or her job" to show how this classification might lead to absurd results. The majority then purports to apply the absurdity doctrine to justify its construction of the littering statute to avoid this hypothetical injustice. But, contrary to the majority's theoretical musings, the ability to conjure up absurd hypothetical scenarios should not change the way that we classify subdivision (a)(1). This principle is easily demonstrated by *State v. Sturdivant*, in which the defendant was indicted for, among other things, kidnapping under N.C.G.S. § 14-39, which prohibited a person from "confin[ing], restrain[ing], or remov[ing] from one place to another, any other person 16 years of age or over without the consent of such person, or any other person under the age of 16 years without the consent of a parent or legal custodian of such person." N.C.G.S. § 14-39(a) (1981); *see Sturdivant*, 304 N.C. at

-7-

309, 283 S.E.2d at 730. In *Sturdivant*, this Court considered, among other issues, whether an indictment "was fatally defective under" the kidnapping statute "because it failed to allege specifically that the kidnapping was effected *without the victim's consent*." 304 N.C. at 308, 283 S.E.2d at 730. Because "the crime of kidnapping cannot be committed if one consents to the act," this Court determined that consent was a defense that did not need to be negated in the indictment. *Id.* at 310, 283 S.E.2d at 731.

Had this majority decided *Sturdivant*, it would have reached the opposite result. After all, under *Sturdivant*'s reasoning, an innocent school bus driver may be arrested and forced to stand trial for multiple kidnapping charges "for doing his or her job." This would never happen, of course—because no judge or magistrate would issue the arrest warrant, *see* N.C.G.S. § 15A-304(b)(1) (Supp. 2018), no prosecutor would pursue the charges, and no grand jury would indict the bus driver.[2]

In any event, the majority has misapplied the absurdity doctrine. Under that doctrine, "where a literal interpretation of the language of a statute will lead to absurd results, or contravene the manifest purpose of the Legislature, as otherwise expressed, the reason and purpose of the law shall control and the strict letter thereof

---

[2] This outlandish illustration highlights the *real* absurdity in this case: the majority's lack of confidence in the men and women serving as grand jurors in our criminal justice system. Despite the majority's dystopian predictions, I find it hard to imagine that a grand jury anywhere in our State would indict hapless bus drivers, sanitation workers, or other hard-working citizens for simply doing their jobs.

shall be disregarded." *State v. Beck*, 359 N.C. 611, 614, 614 S.E.2d 274, 277 (2005) (quoting *Mazda Motors of Am., Inc. v. Sw. Motors, Inc.*, 296 N.C. 357, 361, 250 S.E.2d 250, 253 (1979)); *see also State v. Jones*, 367 N.C. 299, 306, 758 S.E.2d 345, 350 (2014) (applying the absurdity doctrine). The absurdity doctrine, in other words, applies to the act of *interpreting* a statute—to determining the statute's meaning.

The absurdity doctrine does not apply here, however, because this is not a dispute about the statute's meaning. *This* dispute is about how to *classify* the proviso in subdivision (a)(1), not how to interpret it. It is about whether the proviso is an element, not about what the proviso means. So the absurdity doctrine should have no place in our analysis especially when, as here, the hypothetical injustices conjured up by the majority are factually unrelated to this defendant's crime.

In the course of its improper use of the absurdity canon, moreover, the majority has distorted the issue in this case. We are not being asked to decide whether it would be legally proper for a prosecutor or a grand jury to *charge* someone (for example, a sanitation worker) who clearly falls under the auspices of subdivision (a)(1) with a crime. We are being asked to decide whether an indictment of a defendant who clearly did *not* fall within the auspices of subdivision (a)(1) needs to include facts that support that self-evident contention. These two issues are not the same at all, but the majority has unhelpfully blended them together.

For all of these reasons, the majority has erred by failing to apply the only

correct test to the question at hand—namely, whether subdivision (a)(1) amounts to an exception or a qualification under *Norman* and related cases. It is clear, once one applies the exception-versus-qualification paradigm correctly, that subdivision (a)(1) is an exception, and that the indictment here thus did not have to plead any facts to support it. By not applying this paradigm at all, and by reaching a result contrary to the one reached by its proper application, the majority has erred. Furthermore, by abandoning textual analysis in favor of a nebulous "holistic inquiry," the majority leaves trial courts and prosecutors in the untenable position of having to guess how the Supreme Court will ultimately define a criminal offense.

## II

Moving beyond the majority's error on the merits, this Court should reconsider whether vacating the judgment is the appropriate remedy when, as here, defendant failed to object to the indictment at the trial court stage. The Supreme Court of the United States, addressing a similar question in *United States v. Cotton*, concluded that a defective indictment did not deprive a court of jurisdiction. 535 U.S. at 631, 122 S. Ct. at 1785 (stating that "[i]nsofar as [*Ex parte Bain*, 121 U.S. 1, 7 S. Ct. 781 (1887)] held that a defective indictment deprives a court of jurisdiction, *Bain* is overruled"). In light of the many changes to our state's criminal procedure during the twentieth century, a reassessment of this common law jurisdictional rule is long

overdue.[3]

In *Cotton*, the Supreme Court reevaluated its own long-standing rule that a flawed indictment deprives a criminal court of jurisdiction over a case. That jurisdictional rule emerged at the federal level in 1887 in *Ex parte Bain*, a case in which the Supreme Court concluded that an amendment to an indictment "was improper and that therefore 'the jurisdiction of the offence [was] gone, and the court [had] no right to proceed any further in the progress of the case for want of an indictment.'" *Id.* at 629, 122 S. Ct. at 1784 (alterations in original) (quoting *Bain*, 121 U.S. at 13, 7 S. Ct. at 788).

Reevaluating the rule's propriety more than a century later, the Supreme Court reasoned that

> *Bain*'s elastic concept of jurisdiction is not what the term "jurisdiction" means today, *i.e.*, "the courts' statutory or constitutional *power* to adjudicate the case." This latter concept of subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived. Consequently, defects in subject-matter jurisdiction require correction regardless of whether the error was raised in district court. In contrast, the grand jury right can be waived.

*Id.* at 630, 122 S. Ct. at 1785 (citations omitted) (first quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 89. 118 S. Ct. 1003, 1010 (1998); then citing *Louisville &*

---

[3] Given the significant import of this question of law to North Carolina criminal procedure, this Court should request supplemental briefing. So, to be clear, I am not suggesting that we rule on this question without input from the parties.

*Nashville R.R. Co. v. Mottley*, 211 U.S. 149, 152, 29 S. Ct. 42, 43 (1908); and then citing Fed. R. Crim. P. 7(b) and *Smith v. United States*, 360 U.S. 1, 6, 79 S. Ct. 991, 995 (1959)). After cataloguing other cases that departed from the *Bain* rule throughout the twentieth century, the Court overruled the holding in *Bain* that "a defective indictment deprives a court of jurisdiction." *Id.* at 630-31, 122 S. Ct. at 1785.

Our State adopted a number of significant changes to our criminal procedure laws during the twentieth century. In 1950, the voters approved a constitutional amendment permitting criminal defendants to waive their right to indictment in most cases.[4] *State v. Thomas*, 236 N.C. 454, 457, 73 S.E.2d 283, 285 (1952); *see also* N.C. Const. art. I, § 22 ("[A]ny person, when represented by counsel, may, under such regulations as the General Assembly shall prescribe, waive indictment in noncapital cases."). Twenty-four years later, our General Assembly enacted the Criminal Procedure Act, bringing sweeping changes to our rules of criminal procedure. *See generally* Act of Apr. 11, 1974, ch. 1286, 1973 N.C. Sess. Laws (2d Sess. 1974) 490. But in the forty-four years since passage of the Criminal Procedure Act, this Court

---

[4] At least one commentator has argued that the rule permitting waiver of indictments at the federal level is unconstitutional. *See generally* Roger A. Fairfax, Jr., *The Jurisdictional Heritage of the Grand Jury Clause*, 91 Minn. L. Rev. 398, 430-48 (2006) (describing the friction between the United States Constitution and reformers' desire to circumvent the grand jury requirement). Whatever constitutional deficiencies may or may not plague the federal rule permitting waiver, the adoption of a constitutional amendment in our state removes any such questions concerning waiver.

has never squarely considered whether the statute abrogated the common law rule that a defective indictment deprives a criminal court of jurisdiction. Instead, the majority opinion today once again carries forward this relic of the code pleading era.

A

At our founding, many of our laws were derived from the British common law. *See State v. Owen*, 5 N.C. (1 Mur.) 452, 462 (1810) ("[I]t might be asked what the common law of England was when it was adopted by this country, for such as it was, it must be observed."). All of our constitutions have adopted elements of Magna Carta and the English Declaration of Rights. *See* John V. Orth, *The Past is Never Dead: Magna Carta in North Carolina*, 94 N.C. L. Rev. 1635, 1637-38 (2016); John V. Orth, *The Strange Career of the Common Law in North Carolina*, 36 Adel. L. Rev. 23, 23-24 (2015) [hereinafter Orth, *Career of the Common Law*]. And by statute, the General Assembly "re-adopted the colonial legislation and received 'such Parts of the Common Law, as were heretofore in Force and Use within this Territory'." Orth, *Career of the Common Law* at 24 (quoting Act of 1778, ch. 5, sec. 2, 24 *State Records of North Carolina* 162, 162 (photo. reprint 1994) (Walter Clark ed., 1905)); *see also* N.C.G.S. § 4-1 (2017). Indictments were no exception; some of our earliest cases on indictments drew their rules from English common law. *See, e.g.*, *State v. Trexler*, 4 N.C. (Car. L. Rep.) 188, 192-93 (1815); *State v. Adams*, 1 N.C. (Mart.) 56, 58 (1793).

The common law imposed rigid technical requirements on indictments. For example, at common law, an indictment alleging homicide "occasioned by a wound"

had to describe the dimensions of the wound "where they [we]re capable of description." *Owen*, 5 N.C. (1 Mur.) at 461. An indictment that failed to comply with these requirements also failed to confer on the court the power to proceed to judgment on the charge. *See, e.g., Owen*, 5 N.C. (1 Mur.) at 464 (quashing an indictment that did not describe the mortal wound).

At least as early as 1810, our courts questioned the usefulness of imposing such high standards on indictments. As the Court stated in *Owen*:

> [T]here is, in the ancient reasoning on this branch of the law, a degree of metaphysical and frivolous subtilty strongly characteristic of the age in which it was introduced, when at the revival of letters the first efforts of learning were laborious and rude, and scarcely a ray of common sense penetrated the clouds of pedantry. Were a system now to be established, it is probable that much of the jargon of the law would be exploded, and that no objection would prevail against an indictment, or any other instrument, which conveyed to the mind, in an intelligible form, its intended impression. But we must follow in the footsteps of those who have preceded us until the Legislature think fit to interfere; though we have no wish to extend the particularity further.

*Id.* at 458; *see also id.* at 461 ("HENDERSON, J., observed, that if the Court were now about to decide on the propriety of requiring the dimensions of any wound charged in an indictment to be mortal, to be set out, he should be clearly of opinion that it was unnecessary."); *id.* at 463 ("All modern writers agree that the dimensions of the wound must be stated—not for any good reason, he admitted, but it was not for the Court to legislate, but to decide, as they had sworn to do, according to the law.").

In 1811, the General Assembly enacted a statute intended to alleviate some of these technical requirements—likely as a response to *Owen*. *State v. Hunt*, 357 N.C. 257, 268, 582 S.E.2d 593, 600-01 (2003) (citing *State v. Moses*, 13 N.C. (2 Dev.) 452, 463 (1830)). Still in effect today, that enactment provided that an indictment "is sufficient . . . if it expresses the charge against the defendant in a plain, intelligible, and explicit manner; and the same shall not be quashed, nor the judgment thereon stayed, by reason of any informality or refinement, if in the bill or proceeding, sufficient matter appears to enable the court to proceed to judgment." *Id.* at 268, 582 S.E.2d at 601 (alteration in original) (quoting N.C.G.S. § 15-153 (2001)).

Throughout the nineteenth and twentieth centuries, our legislature took further steps to simplify indictments. In 1887, the General Assembly alleviated some of the technical burdens of pleading by permitting short-form indictments for murder. That statute, now codified at N.C.G.S. § 15-144, declares an indictment for murder sufficient if it "allege[s] that the accused person feloniously, willfully, and of his malice aforethought, did kill and murder" the named victim. N.C.G.S. § 15-144 (2017); *see also Hunt*, 357 N.C. at 268-69, 582 S.E.2d at 601 (quoting N.C.G.S. § 15-144 (2001)). When the General Assembly separated murder into two degrees in 1893, it reasserted this desire to simplify murder indictments, declaring that "[n]othing contained in the statute law dividing murder into degrees shall be construed to require any alteration or modification of the existing form of indictment for murder, but the jury before whom the offender is tried shall determine in their

verdict whether the crime is murder in the first or second degree." N.C.G.S. § 15-172 (2017); *see also Hunt*, 357 N.C. at 269, 582 S.E.2d at 601 (quoting N.C.G.S. § 15-172 (2001)). The practical consequence of these statutes is that an indictment need not allege all essential elements of first-degree murder to sustain a guilty verdict for first-degree murder. *Compare* N.C.G.S. § 14-17(a) (2017) ("A murder which shall be perpetrated by means of a nuclear, biological, or chemical weapon of mass destruction . . . , poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate, and premeditated killing, or which shall be committed in the perpetration or attempted perpetration of any arson, rape or a sex offense, robbery, kidnapping, burglary, or other felony committed or attempted with the use of a deadly weapon shall be deemed to be murder in the first degree . . . .") *with id.* § 15-144 (permitting an indictment to omit certain elements of first-degree murder as long as it "allege[s] that the accused person feloniously, willfully, and of his malice aforethought, did kill and murder" the named victim).

Our courts joined the General Assembly in its push toward simplifying the standard for indictments. *See State v. Greer*, 238 N.C. 325, 327, 77 S.E.2d 917, 919 (1953). For indictments not alleging homicide, the rule that emerged was that the indictment must allege all of the essential elements of the charged offense. *E.g.*, *id.*; *State v. Morgan*, 226 N.C. 414, 415, 38 S.E.2d 166, 167 (1946); *State v. Johnson*, 188 N.C. 591, 593, 125 S.E. 183, 184 (1924). This rule ensured that indictments provided criminal defendants with due process by identifying the crime charged, enabling

defendants to prepare for trial, and protecting them from double jeopardy. *See State v. Coker*, 312 N.C. 432, 434-35, 323 S.E.2d 343, 346 (1984) (first citing *State v. Squire*, 292 N.C. 494, 506, 234 S.E.2d 563, 570 (1977); and then citing *State v. Russell*, 282 N.C. 240, 243-44, 192 S.E.2d 294, 296 (1972)).

Nevertheless, our criminal law and procedure became "hopelessly outdated," requiring a significant overhaul from the legislature. *See Legislative Program and Report to the General Assembly of North Carolina by the Criminal Code Commission*, at i (1973). In 1974, the General Assembly enacted a comprehensive reform of our criminal procedure, codified now at Chapter 15A of our General Statutes. Ch. 1286, 1973 N.C. Sess. Laws (2d Sess. 1974) 490. The General Assembly intended these enactments to "mak[e] the law more understandable and improv[e] the administration of justice." *State v. Freeman*, 314 N.C. 432, 436, 333 S.E.2d 743, 746 (1985). As part of this sweeping reform, the General Assembly enacted statutory standards for indictments. N.C.G.S. § 15A-924(a). These standards included a restatement of the common law rule that the indictment contain facts supporting each essential element of the charged offense. *Id.* § 15A-924(a)(5) (requiring that each indictment contain "[a] plain and concise factual statement in each count which, without allegations of an evidentiary nature, asserts facts supporting every element of a criminal offense and the defendant's commission thereof with sufficient precision clearly to apprise the defendant or defendants of the conduct which is the subject of the accusation").

Despite its comprehensive nature, though, the Criminal Procedure Act did not directly address whether indictments that do not meet the Act's statutory standards fail to confer jurisdiction on the court; there is no single provision that explicitly adopts or rejects the common law jurisdictional rule. Compounding this omission is a dearth of cases analyzing whether the Criminal Procedure Act carried forward or abrogated the common law jurisdictional rule. Instead, our cases have reflexively incorporated the common law remedy of arresting judgment on indictments that fail to meet the standards set forth in N.C.G.S. § 15A-924(a). For example, in *State v. Simpson*, 302 N.C. 613, 276 S.E.2d 361 (1981), this Court arrested a judgment based on an indictment that failed to name or identify the defendant in violation of section 15A-924(a)(1). For the rule that a flawed indictment deprived our courts of jurisdiction, *Simpson* relied on *State v. Crabtree*, 286 N.C. 541, 212 S.E.2d 103 (1975). *See Simpson*, 302 N.C. at 616, 276 S.E.2d at 363. But this Court decided *Crabtree* on 12 March 1975—before the effective date of the Criminal Procedure Act. Ch. 1286, sec. 31, 1973 N.C. Sess. Laws (2d Sess. 1974) at 557 (declaring the effective date of the act as 1 July 1975). In contrast, the facts in *Simpson* occurred on 3 July 1979. 302 N.C. at 614, 276 S.E.2d at 362. While the Criminal Procedure Act did not apply to the defendant in *Crabtree*, it *did* apply in *Simpson*. So instead of summarily relying on this common law rule, this Court arguably could have analyzed the Criminal Procedure Act to determine whether the common law rule articulated in *Crabtree* still applied. But it did not.

The cases relied upon by today's majority trace their lineage back to this faulty origin. The majority draws today's rule from *State v. Campbell*, 368 N.C. 83, 86, 772 S.E.2d 440, 443 (2015), in a quote which finds its origins in *Sturdivant*, 304 N.C. at 308, 283 S.E.2d at 729. *Sturdivant*, in turn, drew its rule directly from *Simpson* and *Crabtree*.[5] *See Sturdivant*, 304 N.C. at 308, 283 S.E.2d at 729. Today, the majority perpetuates this obsolescent rule by adding another link to this flawed chain.

Nearly half a century after the passage of the Criminal Procedure Act, this Court continues to apply the common law rule requiring that convictions based on flawed indictments be vacated without determining whether the Criminal Procedure Act abrogated that common law rule. *E.g., State v. Langley*, ___ N.C. ___, ___, 817 S.E.2d 191, 195 (2018) (relying on the common law rule articulated in *State v. McBane*, 276 N.C. 60, 65, 170 S.E.2d 913, 916 (1969)); *State v. McGaha*, 306 N.C. 699, 702-03, 295 S.E.2d 449, 451 (1982) (relying on the common law rule articulated in *State v. Benton*, 275 N.C. 378, 381-82, 167 S.E.2d 775, 777-78 (1969), and *State v. Coppedge*, 244 N.C. 590, 591, 94 S.E.2d 569, 570 (1956)); *cf. State v. Wallace,* 351 N.C. 481, 503, 528 S.E.2d 326, 341 (2000) (relying on the common law rule articulated in *McGaha* and *State v. Sellers*, 273 N.C. 641, 645, 161 S.E.2d 15, 18 (1968)). Admittedly, at this juncture, the doctrine of stare decisis may justify this

---

[5] The majority also relies on *State v. Wagner*, 356 N.C. 599, 601, 572 S.E.2d 777, 779 (2002) (per curiam). *Wagner* cites directly to *State v. Vestal*, 281 N.C. 517, 520, 189 S.E.2d 152, 155 (1972), another case that predates the Criminal Procedure Act.

unwillingness to consider this question; however, the failings of the common law

jurisdictional rule seem to invite legislative reexamination of this question.

B

A thorough analysis of the Criminal Procedure Act reveals significant evidence

that the Act should have displaced the common law jurisdictional rule. "When the

General Assembly as the policy making agency of our government legislates with

respect to the subject matter of any common law rule, the statute supplants the

common law and becomes the law of the State." *News & Observer Publ'g Co. v. State

ex rel. Starling*, 312 N.C. 276, 281, 322 S.E.2d 133, 137 (1984) (citing *McMichael v.

Proctor*, 243 N.C. 479, 483, 91 S.E.2d 231, 234 (1956)).

The Criminal Procedure Act was a comprehensive overhaul of the rules of

criminal procedure in our state. As with all aspects of criminal procedure, the Act

thoroughly addresses indictments and other charging instruments, including the

form of these documents, the methods of challenging their sufficiency, and the

available remedies in the event that these instruments are flawed. Article 49 covers

pleadings and joinder in criminal cases. N.C.G.S. ch. 15A, art. 49 (2017). This article

provides for the use of pleadings in felony cases, *see id.* § 15A-923 (2017), and

establishes clear expectations about the substance of indictments, *see id.* § 15A-924.

But nothing in Chapter 15A, Article 49 indicates that the requirements of section

15A-924(a) are essential to the jurisdiction of the court.

The majority asserts that the General Assembly "explicitly endorsed" the

common law jurisdictional rule by citing to *State v. Greer* in the official commentary to section 15A-924. *See* N.C.G.S. § 15A-924 official cmt. (2017). But the official commentary cites *Greer* only for the proposition that "[t]he pleading rule, requiring factual (but not evidentiary) allegations to support each element, is in accord with traditional ideas." *Id.* (citing *Greer*, 238 N.C. 325, 77 S.E.2d 917). Far from "explicitly endors[ing]" the common law jurisdictional rule, the commentary cites *Greer* to clarify the rule that an indictment include "[a] plain and concise factual statement in each count which . . . asserts facts supporting every element of a criminal offense." *Id.* § 15A-924(a)(5). At best, the commentary is silent on the common law jurisdictional rule.

In fact, the Criminal Procedure Act provides a separate article solely for jurisdictional rules—Article 2, entitled "Jurisdiction." Article 2 is reserved entirely for future codification. N.C.G.S. ch. 15A, art. 2 (2017). And the official commentary to Article 3 ("Venue") indicates that criminal jurisdiction is presently governed by Chapter 7A of our General Statutes. *Id.*, ch. 15A, art. 3 official cmt. (2017) (noting that Article 2 is vacant and that "jurisdiction of courts is still primarily covered in Chapter 7A of the General Statutes"). No provision of Chapter 7A mandates that flawed indictments have the effect of depriving the trial court of jurisdiction. *See, e.g., id.* § 7A-271 (2017) (setting the boundaries of the superior court's jurisdiction). Our General Statutes thus comprehensively provide for criminal pleadings and criminal jurisdiction—the two subjects of the common law jurisdictional rule. And

nowhere has the General Assembly demonstrated any intent to adopt the common law rule. The omission from Articles 2 and 49 of Chapter 15A and from Chapter 7A of any jurisdictional rules concerning indictments therefore indicates that the Criminal Procedure Act probably abrogated the common law jurisdictional rule.

In addition, the statutes establishing remedies for flawed pleadings are not conceptually compatible with a jurisdictional rule for indictments. For example, the Act requires dismissal of charges in a pleading that fails to comply with the requirements of subsection (a). *Id.* § 15A-924(e). But, as the majority aptly highlights, the statute permits this remedy only "[u]pon motion of a defendant." This does not fit within our typical conception of subject-matter jurisdiction. Contrast this with our rules of civil procedure, which require the court to dismiss an action that has jurisdictional defects—even *on its own motion*. *See* N.C. R. Civ. P. 12(h)(3); *accord* Fed. R. Civ. P. 12(h)(3). Similarly, section 15A-955 allows the court to dismiss a case for certain procedural flaws in the grand jury proceedings. But the court may do so only "on motion of the defendant." N.C.G.S. § 15A-955 (2017).

In only one instance does the court have the power to assess, on its own, the validity of the indictment under the current statutory framework. Under Article 29 of the Criminal Procedure Act (entitled "First Appearance Before District Court Judge"), the district court judge is required to examine the charging instrument "and determine whether each charge against the defendant charges a criminal offense within the original jurisdiction of the superior court." *Id.* § 15A-604(a) (2017). But

even if the judge finds the charging instrument flawed, he or she is not *required* to dismiss the charge. *Id.* § 15A-604(b) (2017); *see also* N.C. R. Civ. P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court *shall* dismiss the action." (emphasis added)).

The conclusion that the Criminal Procedure Act supplants the common law rule receives further support from provisions regarding motions and appeals. If in fact the General Assembly had intended to leave the common law rule in place, many of these provisions are redundant. "[A] statute should not be interpreted in a manner which would render any of its words superfluous." *State v. Coffey*, 336 N.C. 412, 417, 444 S.E.2d 431, 434 (1994) (first citing *In re Watson*, 273 N.C. 629, 634, 161 S.E.2d 1, 6-7 (1968); and then citing *State v. Cloninger*, 83 N.C. App. 529, 531, 350 S.E.2d 895, 897 (1986)). "We construe each word of a statute to have meaning, where reasonable and consistent with the entire statute, because '[i]t is always presumed that the legislature acted with care and deliberation . . . .'" *Id.* at 418, 444 S.E.2d at 434 (alterations in original) (quoting *State v. Benton*, 276 N.C. 641, 658, 174 S.E.2d 793, 804 (1970)).

When one applies this principle of statutory construction to the Criminal Procedure Act, it becomes even more apparent that the General Assembly did not intend to carry forward the common law jurisdictional rule. Many provisions within the Criminal Procedure Act separate the concepts of jurisdictional flaws and failure

to plead—sometimes even in the same sentence. For example, one provision states that "[m]otions concerning jurisdiction of the court *or the failure of the pleading to charge an offense* may be made at any time." N.C.G.S. § 15A-952(d) (2017) (emphasis added). Another provision requires the court to dismiss the charges on motion of the defendant if it finds that "[t]he court has no jurisdiction of the offense charged" or "[t]he pleading fails to charge an offense." *Id.* § 15A-954(a)(8), (10) (2017). And the Act automatically preserves for appeal any errors based upon "[l]ack of jurisdiction of the trial court over the offense of which the defendant was convicted," or if "[t]he pleading fails to state essential elements of an alleged violation, as required by G.S. 15A-924(a)(5)." *Id.* § 15A-1446(d)(1), (4) (2017). If the General Assembly had intended for the failure to "assert[ ] facts supporting every element of a criminal offense" to deprive the trial court of jurisdiction, as it did under the common law, then these provisions are plainly superfluous.

The Criminal Procedure Act comprehensively overhauled every aspect of our criminal procedure, including indictments and other charging instruments. But nothing in the Act indicates that the failure to comply with the requirements of section 15A-924(a) would flatly deprive the trial court of jurisdiction to hear the case. "The Criminal Procedure Act was 'designed to remove from our law unnecessary technicalities which tend to obstruct justice.' " *Jones*, 367 N.C. at 313, 758 S.E.2d at 354 (Martin, J., concurring in part and dissenting in part) (quoting *Freeman*, 314 N.C. at 436, 333 S.E.2d at 746). By carrying over the common law rules of indictments,

this Court has "engraft[ed] additional unnecessary burdens upon the due administration of justice." *Freeman*, 314 N.C. at 436, 333 S.E.2d at 746.

## C

In addition to undermining a fundamental purpose of the Criminal Procedure Act, the jurisdictional rule flips the entire purpose of grand jury indictments on its head. By treating section 15A-924(a) as a jurisdictional barrier to criminal prosecution in all cases *except* those charging homicide and certain sex offenses, this Court has given greater protections to littering defendants than to capital defendants.[6]

The technicalities imposed on indictments—and the remedies for the failure to comply with them—emerged in England at a time "when the punishment of crime was so severe as in many cases to shock the moral sense of lawyers, judges and the people generally." *Greer*, 238 N.C. at 327, 77 S.E.2d at 919; Mark Kadish, *Behind the Locked Door of an American Grand Jury: Its History, Its Secrecy, and Its Process*, 24 Fla. St. U. L. Rev. 1, 6-7 (1997) (noting that defendants accused by early iterations of the grand jury "were tried by ordeal, which forced the suspects to prove their innocence by overcoming the laws of nature"—a process that was "punishing, if not

---

[6] Admittedly, the General Assembly relaxed the requirements for a murder indictment, relative to most other felonies, in the nineteenth century. *See* N.C.G.S. § 15-144. But as this section discusses, while the original motivation for the common law jurisdictional rule was to protect defendants in capital cases, it now protects everyone *but* defendants in capital cases.

actually fatal"); *see generally* George J. Edwards, Jr., *The Grand Jury: An Essay* 4-9 (1906) (discussing the various modes of trial and punishment in use when early iterations of the grand jury emerged in England). Around the time of the American Founding, the English criminal code—later dubbed the "bloody code"—contained approximately 200 capital offenses. Phil Handler, *Forging the Agenda: The 1819 Select Committee on the Criminal Laws Revisited*, 25 J. Legal Hist. 249, 249 (2004). Many of these capital crimes are treated as low-level felonies today. *Compare id.* at 251-52 (discussing the sharp increase in executions for forgery in the eighteenth and nineteenth centuries) *with* N.C.G.S. § 14-119(a) (2017) (classifying forgery generally as a Class I felony).

Grand jury indictments thus arose to protect the *lives* of defendants. As Blackstone stated:

> [F]or so tender is the law of England of the lives of the subjects, that no man can be convicted at the suit of the king of any *capital offence*, unless by the unanimous voice of twenty-four of his equals and neighbors: that is, by twelve at least of the grand jury, in the first place, assenting to the accusation; and afterwards, by the whole petit jury, of twelve more, finding him guilty upon his trial.

4 William Blackstone, *Commentaries* *306 (emphasis added); *see also* John Somers, *The Security of Englishmen's Lives* 4 (London, Effingham Wilson 1821) (1681) ("For this purpose it is made a fundamental in our government, that, unless it be by parliament, no man's *life* should be touched for any crime whatsoever, save by the judgment of at least twenty-four men . . . ." (emphasis added)).

Because we adopted the English common law at the founding, North Carolina's criminal law in some ways reflected the draconian bloody code. The case of *State v. Norman* discussed above for its distinction between elements and exceptions in indictments, was a prosecution for bigamy in which the defendant had been sentenced to death. *See* 13 N.C. (2 Dev.) at 227. And other eighteenth and nineteenth century cases reveal a number of capital sentences for stealing horses. *See, e.g., State v. Coulter*, 2 N.C. (1 Hayw.) 3, 3 (1791).

In time, the number of capital offenses in our state decreased. With the adoption of the Constitution of 1868, our state limited capital punishment to convictions for murder, arson, burglary, and rape. N.C. Const. of 1868, art. XI, § 2 ("The object of punishments, being not only to satisfy justice, but also to reform the offender, and thus prevent crime, murder, arson, burglary, and rape, and these only, may be punishable with death, if the General Assembly shall so enact."). Today, murder is the only crime punishable by death in our state. *See* N.C.G.S. § 14-17 (2017). And yet, murder is one of only a handful of crimes for which the General Assembly has permitted short-form indictments. *Id.* § 15-144.

Viewed through this lens, the folly of continued application of the common law jurisdictional rule reveals itself. A defendant convicted of first-degree murder and sentenced to die has no recourse where his indictment fails to "assert[ ] facts supporting every element of" capital murder. But a defendant convicted of felony littering and sentenced to a suspended prison sentence and 18 months of probation

may appeal the indictment, overturn her conviction, and receive a new trial without ever raising the issue at the trial court.

That runs counter to the purpose and history of grand jury indictments. And it incentivizes conduct at trial that may undermine the proper administration of justice. After all, by continuing to apply this common law rule, we are giving a defendant with a defective indictment a reason to "sandbag." *See Wainwright v. Sykes*, 433 U.S. 72, 89, 97 S. Ct. 2497, 2508 (1977). Fully informed of the charges against him, the defendant may proceed to trial hoping for a favorable verdict. If he is found guilty, he may then challenge the indictment on appeal for failing to assert facts supporting an element of the crime. If he is successful, he receives a new trial and a second bite at the apple, even if the facts omitted from the indictment had been uncontestably proven at trial by the prosecution.

This case provides a clear illustration of how the administration of justice can be undermined by operation of the common law jurisdictional rule. Defendant's indictment for felony littering alleges that she "unlawfully, willfully and feloniously did intentionally and recklessly spill and dispose of litter on property not owned by the defendant, the property owned and controlled by the City of Greensboro and not into a litter receptacle . . . . The litter discarded was hazardous waste." This indictment identified the crime charged, enabled defendant to prepare for trial, and protected her from double jeopardy, thereby satisfying constitutional due process requirements. *Cf. Coker*, 312 N.C. at 434-35, 323 S.E.2d at 346. Neither defendant

nor her attorney challenged the pleading during the two-year period between her indictment and her conviction. And, after her conviction, defendant's initial proposed issues on appeal related to the sufficiency of the evidence—not to the sufficiency of the indictment.

Notably, defendant ultimately raised only one issue on appeal to the Court of Appeals: that the indictment failed to allege that the property where she littered was not "designated . . . for the disposal of garbage and refuse." N.C.G.S. § 14-399(a)(1). Defendant did not raise this issue at the trial court, and for good reason. Assuming arguendo that this provision is an essential element of felony littering, its omission did not prejudice her case in any way. The evidence presented at trial showed that she dumped heating fuel in the grass at 709 Elam Avenue in Greensboro and into the street. Defendant could not plausibly argue that the prosecution failed to establish that the land on which she poured heating oil was not publicly designated for that purpose. Had the State been compelled to issue a superseding indictment, its issuance would have had no effect whatsoever on defendant's ability to defend herself or on the trial court proceedings as a whole. The whole exercise would have been nonsensical.

Nevertheless, defendant appealed the omission. And today, defendant succeeds in dumping fuel oil in someone else's yard without consequence, not for the sake of justice, but only because of the rigid technical rules of a bygone era.

## III

While the common law jurisdictional rule is outdated, imprudent, and unnecessary, indictment by grand jury still plays a critical role in protecting individual liberty. The grand jury has long been considered "one of the greatest safeguards of the freedom of the citizen." *State v. Barker*, 107 N.C. 913, 919, 12 S.E. 115, 117 (1890); *see also In re Russo*, 53 F.R.D. 564, 568 (C.D. Cal. 1971) (referring to the grand jury as "a bulwark against . . . oppression and despotism"); *but see generally* Helene E. Schwartz, *Demythologizing the Historic Role of the Grand Jury*, 10 Am. Crim. L. Rev. 701 (1972) (explaining that "the grand jury's history evidences the vulnerability of that institution to pressure, abuse and manipulation by determined partisans" and exploring famous examples). I do not suggest that the grand jury's role as a protective shield has diminished. But the common law jurisdictional rule, when compared to other approaches, imposes substantial burdens on the judicial system without appreciably advancing those celebrated protections. By discarding the common law jurisdictional rule in favor of plain error review, this Court can protect judicial economy and improve the administration of justice while still safeguarding the rights of criminal defendants.

This Court first adopted the plain error rule in *State v. Odom*. 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983). In *Odom*, this Court accepted the federal courts' definition of plain error as "fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done." *Id.* (quoting *United States*

*v. McCaskill*, 676 F.2d 995, 1002 (4th Cir. 1982) (emphasis omitted)). "Our decisions have recognized plain error only 'in truly exceptional cases' when 'absent the error the jury probably would have reached a different verdict.' " *Dogwood Dev. & Mgmt. Co. v. White Oak Transp. Co.*, 362 N.C. 191, 196, 657 S.E.2d 361, 364 (2008) (quoting *State v. Walker*, 316 N.C. 33, 39, 340 S.E.2d 80, 83 (1986)). Presently, this Court invokes the plain error rule to review jury instructions and evidentiary issues. *Id.*

In *Cotton*, the United States Supreme Court, after rejecting the federal common law jurisdictional rule, applied plain error review to the challenged indictment. 535 U.S. at 631, 122 S. Ct. at 1785. The federal plain error test allows appellate courts to correct "(1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights[,]' . . . but only if (4) the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.' " *Id.* at 631-32, 122 S. Ct. at 1785 (quoting *Johnson v. United States*, 520 U.S. 461, 467, 117 S. Ct. 1544, 1549 (1997) (first and third brackets in original)). Observing the " 'overwhelming' and 'essentially uncontroverted' " evidence in the record of the element of the offense that was omitted from the indictment, *id.* at 633, 122 S. Ct. at 1786 (quoting *Johnson*, 520 U.S. at 470, 117 S. Ct. at 1550), the Court held that the failure to include the element in the indictment "did not seriously affect the fairness, integrity, or public reputation of judicial proceedings," *id.* at 632-33, 122 S. Ct. at 1786.

In the sixteen years since the Supreme Court decided *Cotton*, "a growing list of states has flatly rejected earlier rulings characterizing the failure to allege all

material elements as a jurisdictional defect." *State v. Duncan*, 505 S.W.3d 480, 489 n.10 (Tenn. 2016) (citing Wayne LaFave et al., 5 Crim. Proc. § 19.2(e) (4th ed. 2015)); *see also Ex parte Seymour*, 946 So. 2d 536, 538 (Ala. 2006) (listing states that reject the common law jurisdictional rule). Many of these states apply plain error review (or some minor variation) when a defendant challenges a defective indictment without objecting before the trial court. *E.g.*, *State v. Maldonado*, 223 Ariz. 309, 313, 223 P.3d 653, 657 (2010) (en banc) (applying a "fundamental error" standard); *State v. Ortiz*, 162 N.H. 585, 590, 34 A.3d 599, 604 (2011) (explaining that the failure to object to the indictment before the trial court "confines our review to plain error"); *State v. Schrempp*, 2016 S.D. 79, ¶ 13, 887 N.W.2d 744, 748 (2016) (stating that the court "can only review for plain error" when the defendant fails to raise a timely objection to the indictment). And in at least one state retaining the jurisdictional rule, "defects 'which are tardily challenged are liberally construed in favor of validity.' " *State v. Jones*, 140 Idaho 755, 759, 101 P.3d 699, 703 (2004) (quoting *State v. Cahoon*, 116 Idaho 399, 400, 775 P.2d 1241, 1242 (1989)).

Applying our own plain error rule in cases in which the defendant failed to object to a defective indictment at trial would lead to better outcomes by properly aligning defendants' incentives with the aims of justice. After all, one serious threat to the "fairness, integrity, and public reputation of judicial proceedings" arises when defendants, despite "overwhelming and uncontroverted evidence," avoid punishment for crimes because of "error[s] that w[ere] never objected to at trial." *Cotton*, 535 U.S.

at 634, 122 S. Ct. at 1787 (citing *Johnson*, 520 U.S. at 470, 117 S. Ct. at 1550).

But our state has seen this unpalatable scenario play out repeatedly through the application of the common law jurisdictional rule. For example, in *State v. Murrell*, this Court affirmed a Court of Appeals decision to vacate a conviction for robbery with a dangerous weapon. 370 N.C. 187, 197, 804 S.E.2d 504, 511 (2017). In *Murrell*, the defendant robbed a bank by handing the teller a note demanding cash and informing the teller that he was armed. *Id.* at 188, 804 S.E.2d at 505. After his arrest, the defendant admitted to the robbery and told police that he had a weapon in his possession during the robbery. *Id.* at 190, 804 S.E.2d at 506. The indictment charging the defendant with robbery with a dangerous weapon alleged that he committed the robbery "by way of it reasonably appearing to the victim . . . that a dangerous weapon was in the defendant's possession." *Id.* The defendant was convicted, and he appealed his conviction on the grounds that the indictment was defective—an issue he failed to raise before the trial court. *See id.* The Court of Appeals arrested the judgment, holding that the indictment "failed to name any dangerous weapon that defendant allegedly employed." *Id.* at 191, 804 S.E.2d at 507. This Court affirmed that holding. *Id.* at 197, 804 S.E.2d at 511. Thus, despite the threatening note and the defendant's admission to having a pistol at the time of the robbery, the defendant's armed robbery conviction was vacated.

*Murrell* is hardly an outlier. Indeed, there is no shortage of convictions in North Carolina that were vacated due to a technical deficiency in an indictment that

was not challenged before conviction and that had no bearing on the fairness, integrity, or public reputation of judicial proceedings. *See, e.g., State v. Randall*, 228 N.C. App. 282, 748 S.E.2d 775, 2013 WL 3356878 (2013) (unpublished) (vacating a conviction for being a registered sex offender unlawfully on the premises of an elementary school because the indictment failed to specify what his previous offense was or indicate that it involved a victim under the age of sixteen); *State v. Harris*, 219 N.C. App. 590, 597, 724 S.E.2d 633, 638-39 (2012) (same). In *State v. Wynn*, the Court of Appeals vacated a conviction for trafficking in cocaine by sale. 204 N.C. App. 371, 696 S.E.2d 203, 2010 WL 2163766, at *3 (2010) (unpublished). Evidence presented to the trial court in that case showed that, through video and audio surveillance, police witnessed the defendant selling cocaine to a confidential informant. *Id.* at *1. Almost immediately after the sale, police surrounded the defendant and searched his vehicle. *Id.* Inside the vehicle, police found cocaine, crack cocaine, cash, digital scales with white powder residue, and a cell phone. *Id.* At trial, the defendant did not object to the sufficiency of the indictment, choosing instead to raise that issue for the first time when appealing his conviction. *Id.* at *2. Despite the overwhelming evidence of the sale presented at trial, the Court of Appeals vacated the defendant's conviction for trafficking in cocaine by sale because the indictment failed to allege "the name of the individual to whom Defendant allegedly sold the cocaine," even though the State knew the name of that person. *Id.* at *3; *see also State v. Calvino*, 179 N.C. App. 219, 221-22, 632 S.E.2d 839, 842 (2006) (vacating a conviction for sale and delivery of

cocaine on similar grounds).

These decisions clearly illustrate the shortcomings of the common law jurisdictional rule. Compared with alternative approaches to reviewing flawed indictments, as utilized in federal court and the courts of other states, the common law jurisdictional rule unnecessarily hinders the proper administration of justice. This Court can—and should—reconsider its rigid adherence to this archaic rule. Alternatively, I respectfully request that the General Assembly reexamine a rule that perpetuates misaligned incentives and undermines the criminal justice system.

\* \* \*

In summary, the majority opinion misconstrues and mischaracterizes N.C.G.S. § 14-399 to discover an essential element of littering that the text of the statute does not contain to correct an injustice that does not exist. In so doing, the majority engages in an amorphous "holistic inquiry" instead of providing lower courts and practitioners with a meaningful standard for distinguishing elements from affirmative defenses. More fundamentally, the Court misses an opportunity to reevaluate an obsolete rule that detrimentally impacts the administration of justice in our State. I therefore respectfully dissent.

Justice NEWBY joins in this dissenting opinion.