AFFIDAVIT
"On the 5th day of June, in the year 1809, this deponent was walking on the pavement near John Trexler's house in the town of Salisbury, and stopped at Trexler's door to inquire of him how the frame of Mull's house went together at the raising, at which time Trexler invited deponent into his house. After some conversation, deponent asked Trexler to go to Pinkston's Tavern, which was the adjoining house, to drink some grog, which he declined, whereupon deponent went to Pinkston's himself, and, after being there a short time, returned to Trexler's house and found Trexler lying on the bed. It was about 11 o'clock in the *Page 147 
forenoon. Upon being invited to sit, deponent took a chair and sat upon it near the foot of the bed on which Trexler then lay. Trexler asked deponent how he came on with his affairs, which were then in a critical situation, to which deponent replied, `Bad enough,' (189) but he was then preparing to go to Virginia for the purpose of collecting a judgment due to him there, which, he hoped, would enable him to prosecute his business with greater advantage. Deponent further stated that he was then going to Mr. Evan Alexander's to settle with him, and receive a balance due, at which Trexler expressed some surprise that Mr. Alexander should be in deponent's debt, and that he should have delayed payment so long. Deponent said that Trexler need not be surprised at it, and drew out his pocketbook to show him a statement of the account; in doing which some papers which had been in the pocketbook fell upon the floor. Deponent then laid his pocketbook, with the remainder of the papers, on the foot of the bed and turned round to pick up those which had fallen. In the meantime Trexler changed his position on the bed, and lay with his head towards the foot of the bed, as deponent thought, for the purpose of being more conveniently situated to see the papers. As he then lay, the pocketbook and papers were immediately before him. While deponent was picking up the papers from the floor, Trexler said he thought that deponent was very careless with his papers. Deponent replied, Yes, and looking round, observed Trexler, in a secret way, opening a note of the Bank of the United States for $100, which deponent had carefully placed in the pocketbook that morning for the purpose of having it changed for the other money. In attempting to take the bank note out of Trexler's hands the bank note was fully opened, and Trexler clinched his hand upon it, and refused to give it up, saying that he would not give it up unless deponent would tell him what it was. Deponent at first observed that it was no business of his what it was; but that it was money, and putting up the pocketbook and papers, finding Trexler still refusing to give up the bank note, deponent jumped upon him as he lay on the bed, to endeavor to force it from him. After struggling with him for some time deponent told Trexler that he would spoil the bill, upon which he said if deponent would let him get up, he would return it. As soon as deponent permitted him to rise from the bed, Trexler attempted to make his (190) escape from the room in which he then was, to another room. Deponent seized him a second time, and endeavored, partly by force and partly by intercession, to induce him to return it; Trexler still refusing to return it, and at the same time insisting that deponent should tell him what it was, upon which deponent at length said, `To be plain with you,John, it is a bank note of one hundred dollars.' As soon as deponent *Page 148 
had made this declaration, Trexler whooped and made a great noise, said it was more, and swore he would not take $500 for it. Trexler then made his escape into another room, where there was a desk, and while deponent was struggling with him at the desk he took out of the desk a red Morocco pocketbook, after which the bank note disappeared, and deponent has never seen it since to his knowledge. In a few minutes afterwards, when deponent remonstrated with Trexler concerning such conduct, he (Trexler) said if it was deponent's bill, Trexler's daughter had found it in the garden. At another time Trexler told deponent that one of his journeymen (Dillon) had found it and given it to his daughter, — all which assertions deponent positively contradicted, and said they were false. Trexler afterwards, in the same day, agreed that he would go with deponent to Peter Brown's store, and if he would say that deponent had had such a bill, that he (Trexler) would return it. At the time appointed, he failed to attend. About two days afterwards deponent met Trexler in the street and again demanded the bank note, upon which Trexler asked deponent if he would swear to the bill, which deponent said he would do, and would also prove it by Peter Brown (now deceased). When deponent urged him to go before a magistrate for the purpose, Trexler equivocated and asked deponent if he knew the number of the bill, and some other questions of a similar nature, but declined going to a magistrate as deponent requested. The conversation at this time ended by Trexler's saying that deponent never would get the bank note in question, without he could get it by law. Deponent told (191) him then that he would immediately employ Mr. Henderson to obtain redress by law, and turned away; upon which Trexler said that if deponent wanted a horse, he would give him his bay horse, worth $70, and $30 in silver, for the bank note. Deponent refused to accept this offer, and immediately employed counsel to prosecute him. Next day Trexler came to deponent and offered to return a Cape Fear bank note of $1, and said that was the note he had taken from deponent; upon which deponent had him taken with a State warrant — and further, saith not."
It has been argued by the prisoner's counsel that an indictment for a trespass will not lie on the facts set forth in this case, owing, as it is alleged, to the want of an actual breach of the peace, the bank note being taken from the pocketbook privily, whilst the prosecutor was collecting the papers which had fallen; and that if any offense was committed, it was larceny; and even if the Court should be of opinion actual force was
employed, yet it would then be robbery, and in both instances the trespass be merged in the felony. *Page 149 
As to the latter argument, we find no difficulty in disposing of it. The bank note not being a subject of larceny, no felony could be committed to extinguish the trespass. And as to the first, we all agree that if the prosecutor, upon discovering the note in prisoner's hands, had only demanded
it, and the transaction had there broken up, the refusal to deliver, and the subsequent detention, could not have, nor does it have, any influence upon the case, so as to make the first taking forcible; for though it is true the prisoner had then committed a complete felony (supposing the note a proper subject), yet, as the transaction did not then break up, but was continued by the prosecutor at the same instant seizing the prisoner, who then had the note, which continued in sight
and which had never been out of reach, it was to every substantial purposereduced to possession; and the prosecutor being then overcome by the prisoner in the scuffle, the carrying off the note constituted the actual
asportation; for where there is one continuing transaction, though there be several distinct asportations in law, yet the party may be indicted for the final carrying away, and all who concur are guilty, (192) though they were not privy to the first or intermediate acts.
King v. Dyer which is cited 2 East's Crown Law, 767, was where Dyer, the master of a boat, was employed to bring on shore a quantity of barilla, and Dister and others were employed as laborers to remove the barilla, after it was landed, to Hawkins' warehouse; that while the barilla was in the boat some part of it was separated from the rest and concealed in another part of the boat, without the privity of Dyer; that afterwards Dyer and Dister, and the others who had removed and concealed it, carried it off, and though a complete legal taking and carrying away was performed before Dyer had any agency or knowledge, yet as he joined in the final actual asportation, he was held guilty and convicted. To the same effect is King v. Atwell, cited in the same book.
Suppose a thief should privately take money from one pocket and place it in another for the convenience of handling it, at a suitable time, in his comrade, and, when he attempted to take it out again, the owner should seize his hand, upon which a scuffle takes place and the owner is overpowered or awed to desist, and the thief goes off with the money. This, surely, would be robbery.
In the present case, the prisoner being seized before the note was even out of the prosecutor's presence, and being then in reach, was as much in his possession as the pocketbook he had laid down. Had the prosecutor caught hold of the bill and then been overcome or intimidated, it would have been robbery; and if an actual touching of the note be essential to the regaining possession (which I, for my own part, by no means *Page 150 
think necessary), the jury had ample room to presume it from the circumstances, and should have been so instructed.
The snatching anything unawares is not considered a taking by force;
but if there be a struggle to keep it, or any violence done the person, as in Lapier's case of the tearing the ear, the taking is a robbery. Buller,J., in Rex v. Horner, cited in Leach's Crown Law, in a note to Baker's case. This distinction steers clear of the cases cited in Hawkins (193) and Hale of a stealing of the purse privily, and upon the owner's discovering it in the hands of the thief, demanding it, when the thief threatened to pull his house from over his head if he said anything about it, and rode off, which was held to be no robbery. It is also to be remarked that at that period the prevailing opinion seemed to be that a taking to constitute robbery must be through fear.
Wherefore, we are all of opinion the jury did right in finding the prisoner guilty; that it was a rank trespass, and the rule for a new trial should be discharged.
It would be a reproach to the law to consider the taking a hat which a frighted man had let fall accidentally from his head, a robbery; the lifting of a sash, a breaking of a house, so as in both instances to constitute capital offenses, and not to consider the present a taking by violence, when the final carrying away was by the dint of strength.
NOTE. — Upon the subject of an indictable trespass to personal property, see S. v. Flowers, 6 N.C. 225; S. v. McDowell, 8 N.C. 449; S.v. Mills, 13 N.C. 420; S. v. Love, 19 N.C. 267; S. v. Bennett, 29 N.C. 43;S. v. Hemphill, ibid., 109.
Cited: S. v. Love, 19 N.C. 267; S. v. John, 50 N.C. 170.