Chief Justice MARTIN dissenting.
I write separately to discuss the significant failings of the jurisdictional approach the majority uses to evaluate the sufficiency of criminal indictments. Taking my cue from United States v. Cotton , 535 U.S. 625, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002), the time has come to reconsider this antiquated approach to flawed indictments in light of the extensive statutory, constitutional, and conceptual changes in criminal procedure during the twentieth century. Moreover, the General Assembly may wish to consider revisions to our criminal code to lessen the detrimental impact of the common law jurisdictional approach on the administration of justice in North Carolina.
In addition to my concerns about the common law jurisdictional rule, I also write separately because the majority creates (under the guise of interpretation) its own criminal offense and fails to grapple **899 with or apply our precedents on the classification of criminal statutory provisos. And, in so doing, the majority creates significant uncertainty by failing to establish a discernible method to assist lower courts and prosecutors in distinguishing between elements and defenses.
I
A valid indictment must comply with requirements of form and substance, see N.C.G.S. §§ 15A-644(a), -924(a) (2017), including the statutory requirement that an indictment contain facts supporting every element of the charged offense, id. § 15A-924(a)(5).
The State indicted defendant for felony littering under N.C.G.S. § 14-399. In relevant part, that statute provides:
(a) No person ... shall intentionally or recklessly throw, scatter, spill or place ... or otherwise dispose of any litter upon any public property or private property not owned by the person within this State or in the waters of this State ... except:
(1) When the property is designated by the State or political subdivision thereof for the disposal of garbage and refuse, and the person is authorized to use the property for this purpose....
....
(e) Any person who violates subsection (a) of this section in an amount exceeding 500 pounds or in any quantity for commercial purposes, or who discards litter that is a hazardous waste ... is guilty of a Class I felony.
Id. § 14-399 (2017). According to the majority, the merits of this case hinge on whether the proviso in subdivision (a)(1) is an element of felony littering or an affirmative defense.
In deciding this issue, we are confronted with a two-part inquiry. First, the Court must ask whether, omitting the proviso, the primary provision in the statute states a "complete and definite" description of the crime. State v. Dobbins , 277 N.C. 484, 502, 178 S.E.2d 449, 460 (1971) (quoting State v. Connor , 142 N.C. 700, 701, 55 S.E. 787, 788 (1906) ). If it does not, then any proviso that completes the description must be included in the indictment. See id. (quoting Connor , 142 N.C. at 701, 55 S.E. at 788 ). Alternatively, *799 if the primary provision does state a complete and definite description of the crime, then our next task is to classify the proviso as either an exception or a qualification. **900 Connor , 142 N.C. at 701-02, 55 S.E. at 788-89 ; see also State v. Norman , 13 N.C. 222, 226 1829 (describing the two kinds of provisos). This distinction-used by this Court since at least 1829-is fairly straightforward: exceptions remove certain cases from the operation of the statute, while qualifications bring a case within the operation of the statute. Norman , 13 N.C. (2 Dev.) at 226. An exception does not need to be negated in the indictment; the onus is on the defendant to raise the exception as a defense. Id. But if the proviso is a qualification, "the indictment must bring the case within the proviso." Id.
In State v. Moore , for example, this Court considered an indictment for the illegal sale of intoxicating liquors. The relevant statute provided "[t]hat it shall be unlawful for any person ... other than druggists and medical depositaries [sic] duly licensed thereto , to engage in the business of selling, exchanging, bartering, giving away for the purpose of direct or indirect gain, or otherwise handling spirituous, vinous or malt liquors." 166 N.C. 284, 285-86, 81 S.E. 294, 295 (1914) (emphasis added) (quoting Act of Mar. 3, 1913, ch. 44, sec. 1, 1913 N.C. Pub. [Sess.] Laws 76, 76-77). The defendant challenged the sufficiency of the charging warrant[1] because it failed to allege that he was not a druggist or a medical depository. Id. at 286, 81 S.E. at 295. But this Court rejected that challenge because "the exception in the statute is no part of the definition or description of the offense, but simply withdraws certain persons from its operation." Id. at 288, 81 S.E. at 296.
Before we determine whether the primary provision of the statute states a "complete and definite" description of a crime, we must bear in mind the respective roles of the legislative and judicial branches. The General Assembly, as the lawmaking arm of the people, has the power to define criminal activity. See N.C. Const. art. II, § 1 ; State v. Hill , 272 N.C. 439, 443, 158 S.E.2d 329, 332 (1968) ("It is the General Assembly which is to define crimes and ordain their punishment." (quoting State v. Whitehurst , 212 N.C. 300, 303, 193 S.E. 657, 660 (1937) ) ). The courts, on the other hand, have the power to interpret the laws passed by the General Assembly and to determine whether these laws, either facially or as applied, violate the constitution. See N.C. Const. art. IV, § 1 ; Bayard v. Singleton , 1 N.C. (Mart.) 5, 6-7 (1787).
**901 Here, the statute's primary provision states that "[n]o person ... shall intentionally or recklessly throw, scatter, spill or place ... any litter upon any public property or private property not owned by the person." N.C.G.S. § 14-399(a). This provision creates criminal liability to redress the societal ill of littering. It defines the required culpability-intent or recklessness. It is, therefore, a complete and definite statement of a crime: no person may intentionally or recklessly throw or spill litter on any public property or on private property that he or she does not own.
But the majority today usurps the role of the General Assembly by summarily declaring-as part of a so-called "holistic inquiry"-that the crime of littering "is not complete unless it excludes authorized locations and persons from its definition." In other words, the majority declares that the crime of littering must, by definition, be committed without privilege or consent to be a crime. But this conclusion not only arrogates to this Court a power that is properly left in the General Assembly's hands; it also causes the majority's reasoning to collapse under the weight of past precedent. This Court has, on more than one occasion, stated that
[t]hough the general rule is, that a proviso contained in the same section of the law ... in which the defence is defined, must be negatived [in the indictment], yet where the charge itself is of such a nature that the formal statement of it is equivalent in *800 meaning to such negative averment, there is no reason for adhering to the rule , and such a case constitutes an exception to it.
State v. Sturdivant , 304 N.C. 293, 310, 283 S.E.2d 719, 730-31 (1981) (ellipsis in original) (emphasis added) (quoting State v. Bryant , 111 N.C. 693, 694, 16 S.E. 326, 326 (1892) ). Stated differently, if the crime, by its very nature, must be committed without privilege or consent, then the indictment does not need to negate privilege or consent. It follows that if the majority's characterization of the crime of littering is correct-that a person can litter only if he or she does so without privilege or consent-then it is unnecessary to specifically assert the lack of privilege or consent in the indictment.
Because subsection (a) is a complete and definite description of the crime, the appropriate next step for this Court is to determine whether subdivision (a)(1) is an exception or a qualification to subsection (a). And, when analyzed under our long-standing precedent, subdivision (a)(1) is unquestionably an exception.
Once again, this analysis is straightforward: does the proviso subtract from the crime described in subsection (a), or does it bring **902 additional cases within its operation? See Norman , 13 N.C. (2 Dev.) at 226. Subsection (a) prohibits disposing of litter on public property or private property belonging to another person. N.C.G.S. § 14-399(a). But subdivision (a)(1) allows disposal of litter on land "designated ... for the disposal of garbage and refuse" by persons "authorized to use the property for [that] purpose." Id. § 14-399(a)(1). This proviso removes a specific act (disposing of litter on land designated for that purpose) committed by a specific class of persons (persons authorized to use that land) from the general definition in subsection (a). It is therefore an "exception in the statute [that] is no part of the definition or description of the offense." Moore , 166 N.C. at 288, 81 S.E. at 296. Accordingly, subdivision (a)(1) need not be alleged in the indictment.
By contrast, subsection (e) provides a qualification. For the conduct described in subsection (a) to be a felony, the litter must be hazardous waste, litter "in an amount exceeding 500 pounds," or litter "in any quantity for commercial purposes." N.C.G.S. § 14-399(e). This proviso qualifies the offense described in subsection (a), and an indictment that tracks only the language of subsection (a) would not support a conviction for felony littering. Thus, a felony littering indictment must include the qualification in subsection (e). In this case, the indictment did so, asserting that "[t]he litter discarded was hazardous waste," which "br[ought] the case within the proviso." Norman , 13 N.C. (2 Dev.) at 226.
The majority opinion objects to the classification of subdivision (a)(1) as an exception, raising the Court of Appeals' example of a sanitation worker being "criminally charged for doing his or her job" to show how this classification might lead to absurd results. The majority then purports to apply the absurdity doctrine to justify its construction of the littering statute to avoid this hypothetical injustice. But, contrary to the majority's theoretical musings, the ability to conjure up absurd hypothetical scenarios should not change the way that we classify subdivision (a)(1). This principle is easily demonstrated by State v. Sturdivant , in which the defendant was indicted for, among other things, kidnapping under N.C.G.S. § 14-39, which prohibited a person from "confin[ing], restrain[ing], or remov[ing] from one place to another, any other person 16 years of age or over without the consent of such person, or any other person under the age of 16 years without the consent of a parent or legal custodian of such person." N.C.G.S. § 14-39(a) (1981) ; see Sturdivant , 304 N.C. at 309, 283 S.E.2d at 730. In Sturdivant , this Court considered, among other issues, whether an indictment "was fatally defective under" the kidnapping statute "because it failed to allege specifically that the kidnapping was effected without the victim's consent ."
**903 304 N.C. at 308, 283 S.E.2d at 730. Because "the crime of kidnapping cannot be committed if one consents to the act," this Court determined that consent was a defense that did not need to be negated in the indictment. Id. at 310, 283 S.E.2d at 731.
Had this majority decided Sturdivant , it would have reached the opposite result. After *801 all, under Sturdivant 's reasoning, an innocent school bus driver may be arrested and forced to stand trial for multiple kidnapping charges "for doing his or her job." This would never happen, of course-because no judge or magistrate would issue the arrest warrant, see N.C.G.S. § 15A-304(b)(1) (Supp. 2018), no prosecutor would pursue the charges, and no grand jury would indict the bus driver.[2]
In any event, the majority has misapplied the absurdity doctrine. Under that doctrine, "where a literal interpretation of the language of a statute will lead to absurd results, or contravene the manifest purpose of the Legislature, as otherwise expressed, the reason and purpose of the law shall control and the strict letter thereof shall be disregarded." State v. Beck , 359 N.C. 611, 614, 614 S.E.2d 274, 277 (2005) (quoting Mazda Motors of Am., Inc. v. Sw. Motors, Inc. , 296 N.C. 357, 361, 250 S.E.2d 250, 253 (1979) ); see also State v. Jones , 367 N.C. 299, 306, 758 S.E.2d 345, 350 (2014) (applying the absurdity doctrine). The absurdity doctrine, in other words, applies to the act of interpreting a statute-to determining the statute's meaning.
The absurdity doctrine does not apply here, however, because this is not a dispute about the statute's meaning. This dispute is about how to classify the proviso in subdivision (a)(1), not how to interpret it. It is about whether the proviso is an element, not about what the proviso means. So the absurdity doctrine should have no place in our analysis especially when, as here, the hypothetical injustices conjured up by the majority are factually unrelated to this defendant's crime.
In the course of its improper use of the absurdity canon, moreover, the majority has distorted the issue in this case. We are not being asked to decide whether it would be legally proper for a prosecutor or a grand jury to charge someone (for example, a sanitation worker) who clearly falls under the auspices of subdivision (a)(1) with a crime. We are being **904 asked to decide whether an indictment of a defendant who clearly did not fall within the auspices of subdivision (a)(1) needs to include facts that support that self-evident contention. These two issues are not the same at all, but the majority has unhelpfully blended them together.
For all of these reasons, the majority has erred by failing to apply the only correct test to the question at hand-namely, whether subdivision (a)(1) amounts to an exception or a qualification under Norman and related cases. It is clear, once one applies the exception-versus-qualification paradigm correctly, that subdivision (a)(1) is an exception, and that the indictment here thus did not have to plead any facts to support it. By not applying this paradigm at all, and by reaching a result contrary to the one reached by its proper application, the majority has erred. Furthermore, by abandoning textual analysis in favor of a nebulous "holistic inquiry," the majority leaves trial courts and prosecutors in the untenable position of having to guess how the Supreme Court will ultimately define a criminal offense.
II
Moving beyond the majority's error on the merits, this Court should reconsider whether vacating the judgment is the appropriate remedy when, as here, defendant failed to object to the indictment at the trial court stage. The Supreme Court of the United States, addressing a similar question in United States v. Cotton , concluded that a defective indictment did not deprive a court of jurisdiction. 535 U.S. at 631, 122 S.Ct. at 1785 (stating that "[i]nsofar as [ Ex parte Bain , 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887) ] held that a defective indictment deprives a court of jurisdiction, Bain is overruled"). In light of the many changes to our state's criminal procedure during the twentieth century, a reassessment of this common law jurisdictional rule is long overdue.[3]
*802 In Cotton , the Supreme Court reevaluated its own long-standing rule that a flawed indictment deprives a criminal court of jurisdiction over a case. That jurisdictional rule emerged at the federal level in 1887 in Ex parte Bain , a case in which the Supreme Court concluded that an amendment to an indictment "was improper and that therefore 'the jurisdiction of the offence [was] gone, and the court [had] no right to proceed any further in the progress of the case for want of an indictment.' " Id. at 629, 122 S.Ct. at 1784 (alterations in original) (quoting Bain , 121 U.S. at 13, 7 S.Ct. at 788 ).
**905 Reevaluating the rule's propriety more than a century later, the Supreme Court reasoned that
Bain 's elastic concept of jurisdiction is not what the term "jurisdiction" means today, i.e. , "the courts' statutory or constitutional power to adjudicate the case." This latter concept of subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived. Consequently, defects in subject-matter jurisdiction require correction regardless of whether the error was raised in district court. In contrast, the grand jury right can be waived.
Id. at 630, 122 S. Ct. at 1785 (citations omitted) (first quoting Steel Co. v. Citizens for Better Env't , 523 U.S. 83, 89, 118 S.Ct. 1003, 1010, 140 L.Ed.2d 210 (1998) ; then citing Louisville & Nashville R.R. Co. v. Mottley , 211 U.S. 149, 152, 29 S.Ct. 42, 43, 53 L.Ed. 126 (1908) ; and then citing Fed. R. Crim. P. 7(b) and Smith v. United States , 360 U.S. 1, 6, 79 S.Ct. 991, 995, 3 L.Ed.2d 1041 (1959) ). After cataloguing other cases that departed from the Bain rule throughout the twentieth century, the Court overruled the holding in Bain that "a defective indictment deprives a court of jurisdiction." Id. at 630-31, 122 S.Ct. at 1785.
Our State adopted a number of significant changes to our criminal procedure laws during the twentieth century. In 1950, the voters approved a constitutional amendment permitting criminal defendants to waive their right to indictment in most cases.[4] State v. Thomas , 236 N.C. 454, 457, 73 S.E.2d 283, 285 (1952) ; see also N.C. Const. art. I, § 22 ("[A]ny person, when represented by counsel, may, under such regulations as the General Assembly shall prescribe, waive indictment in noncapital cases."). Twenty-four years later, our General Assembly enacted the Criminal Procedure Act, bringing sweeping changes to our rules of criminal procedure. See generally Act of Apr. 11, 1974, ch. 1286, 1973 N.C. Sess. Laws (2d Sess. 1974) 490. But in the forty-four years since passage of the Criminal Procedure Act, this Court has never squarely considered whether the statute abrogated the common law rule that a defective indictment deprives a criminal court of jurisdiction. Instead, **906 the majority opinion today once again carries forward this relic of the code pleading era.
A
At our founding, many of our laws were derived from the British common law. See State v. Owen , 5 N.C. 452, 462 1810 ("[I]t might be asked what the common law of England was when it was adopted by this country, for such as it was, it must be observed."). All of our constitutions have adopted elements of Magna Carta and the English Declaration of Rights. See John V. Orth, The Past is Never Dead: Magna Carta in North Carolina , 94 N.C. L. Rev. 1635, 1637-38 (2016) ; John V. Orth, The Strange Career of the Common Law in North Carolina , 36 Adel. L. Rev. 23, 23-24 (2015) [hereinafter Orth, Career of the Common Law ]. And by statute, the General Assembly "re-adopted the colonial legislation and received 'such Parts of the Common Law, as were *803 heretofore in Force and Use within this Territory'." Orth, Career of the Common Law at 24 (quoting Act of 1778, ch. 5, sec. 2, 24 State Records of North Carolina 162, 162 (photo. reprint 1994) (Walter Clark ed., 1905) ); see also N.C.G.S. § 4-1 (2017). Indictments were no exception; some of our earliest cases on indictments drew their rules from English common law. See, e.g. , State v. Trexler , 4 N.C. (Car. L. Rep.) 188, 192-93 (1815) ; State v. Adams , 1 N.C. (Mart.) 56, 58 (1793).
The common law imposed rigid technical requirements on indictments. For example, at common law, an indictment alleging homicide "occasioned by a wound" had to describe the dimensions of the wound "where they [we]re capable of description." Owen , 5 N.C. (1 Mur.) at 461. An indictment that failed to comply with these requirements also failed to confer on the court the power to proceed to judgment on the charge. See, e.g. , Owen , 5 N.C. (1 Mur.) at 464 (quashing an indictment that did not describe the mortal wound ).
At least as early as 1810, our courts questioned the usefulness of imposing such high standards on indictments. As the Court stated in Owen :
[T]here is, in the ancient reasoning on this branch of the law, a degree of metaphysical and frivolous subtilty strongly characteristic of the age in which it was introduced, when at the revival of letters the first efforts of learning were laborious and rude, and scarcely a ray of common sense penetrated the clouds of pedantry. Were a system now to be established, it is probable that much of the jargon of the law would be exploded, and that no **907 objection would prevail against an indictment, or any other instrument, which conveyed to the mind, in an intelligible form, its intended impression. But we must follow in the footsteps of those who have preceded us until the Legislature think fit to interfere; though we have no wish to extend the particularity further.
Id. at 458 ; see also id. at 461 ("HENDERSON, J., observed, that if the Court were now about to decide on the propriety of requiring the dimensions of any wound charged in an indictment to be mortal, to be set out, he should be clearly of opinion that it was unnecessary."); id. at 463 ("All modern writers agree that the dimensions of the wound must be stated-not for any good reason, he admitted, but it was not for the Court to legislate, but to decide, as they had sworn to do, according to the law.").
In 1811, the General Assembly enacted a statute intended to alleviate some of these technical requirements-likely as a response to Owen . State v. Hunt , 357 N.C. 257, 268, 582 S.E.2d 593, 600-01 (2003) (citing State v. Moses , 13 N.C. 452, 463 1830 ). Still in effect today, that enactment provided that an indictment "is sufficient ... if it expresses the charge against the defendant in a plain, intelligible, and explicit manner; and the same shall not be quashed, nor the judgment thereon stayed, by reason of any informality or refinement, if in the bill or proceeding, sufficient matter appears to enable the court to proceed to judgment." Id. at 268, 582 S.E.2d at 601 (alteration in original) (quoting N.C.G.S. § 15-153 (2001) ).
Throughout the nineteenth and twentieth centuries, our legislature took further steps to simplify indictments. In 1887, the General Assembly alleviated some of the technical burdens of pleading by permitting short-form indictments for murder. That statute, now codified at N.C.G.S. § 15-144, declares an indictment for murder sufficient if it "allege[s] that the accused person feloniously, willfully, and of his malice aforethought, did kill and murder" the named victim. N.C.G.S. § 15-144 (2017) ; see also Hunt , 357 N.C. at 268-69, 582 S.E.2d at 601 (quoting N.C.G.S. § 15-144 (2001) ). When the General Assembly separated murder into two degrees in 1893, it reasserted this desire to simplify murder indictments, declaring that "[n]othing contained in the statute law dividing murder into degrees shall be construed to require any alteration or modification of the existing form of indictment for murder, but the jury before whom the offender is tried shall determine in their verdict whether the crime is murder in the first or second degree." N.C.G.S. § 15-172 (2017) ; see also Hunt , 357 N.C. at 269, 582 S.E.2d at 601 (quoting **908 N.C.G.S. § 15-172 (2001) ). The practical consequence of these statutes is that an indictment need not allege all essential *804 elements of first-degree murder to sustain a guilty verdict for first-degree murder. Compare N.C.G.S. § 14-17(a) (2017) ("A murder which shall be perpetrated by means of a nuclear, biological, or chemical weapon of mass destruction ..., poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate, and premeditated killing, or which shall be committed in the perpetration or attempted perpetration of any arson, rape or a sex offense, robbery, kidnapping, burglary, or other felony committed or attempted with the use of a deadly weapon shall be deemed to be murder in the first degree....") with id. § 15-144 (permitting an indictment to omit certain elements of first-degree murder as long as it "allege[s] that the accused person feloniously, willfully, and of his malice aforethought, did kill and murder" the named victim).
Our courts joined the General Assembly in its push toward simplifying the standard for indictments. See State v. Greer , 238 N.C. 325, 327, 77 S.E.2d 917, 919 (1953). For indictments not alleging homicide, the rule that emerged was that the indictment must allege all of the essential elements of the charged offense. E.g. , id. ; State v. Morgan , 226 N.C. 414, 415, 38 S.E.2d 166, 167 (1946) ; State v. Johnson , 188 N.C. 591, 593, 125 S.E. 183, 184 (1924). This rule ensured that indictments provided criminal defendants with due process by identifying the crime charged, enabling defendants to prepare for trial, and protecting them from double jeopardy. See State v. Coker , 312 N.C. 432, 434-35, 323 S.E.2d 343, 346 (1984) (first citing State v. Squire , 292 N.C. 494, 506, 234 S.E.2d 563, 570 (1977) ; and then citing State v. Russell , 282 N.C. 240, 243-44, 192 S.E.2d 294, 296 (1972) ).
Nevertheless, our criminal law and procedure became "hopelessly outdated," requiring a significant overhaul from the legislature. See Legislative Program and Report to the General Assembly of North Carolina by the Criminal Code Commission , at i (1973). In 1974, the General Assembly enacted a comprehensive reform of our criminal procedure, codified now at Chapter 15A of our General Statutes. Ch. 1286, 1973 N.C. Sess. Laws (2d Sess. 1974) 490. The General Assembly intended these enactments to "mak[e] the law more understandable and improv[e] the administration of justice." State v. Freeman , 314 N.C. 432, 436, 333 S.E.2d 743, 746 (1985). As part of this sweeping reform, the General Assembly enacted statutory standards for indictments. N.C.G.S. § 15A-924(a). These standards included a restatement of the common law rule that the indictment contain facts supporting each essential element of the charged offense. Id. § 15A-924(a)(5) (requiring that each **909 indictment contain "[a] plain and concise factual statement in each count which, without allegations of an evidentiary nature, asserts facts supporting every element of a criminal offense and the defendant's commission thereof with sufficient precision clearly to apprise the defendant or defendants of the conduct which is the subject of the accusation").
Despite its comprehensive nature, though, the Criminal Procedure Act did not directly address whether indictments that do not meet the Act's statutory standards fail to confer jurisdiction on the court; there is no single provision that explicitly adopts or rejects the common law jurisdictional rule. Compounding this omission is a dearth of cases analyzing whether the Criminal Procedure Act carried forward or abrogated the common law jurisdictional rule. Instead, our cases have reflexively incorporated the common law remedy of arresting judgment on indictments that fail to meet the standards set forth in N.C.G.S. § 15A-924(a). For example, in State v. Simpson , 302 N.C. 613, 276 S.E.2d 361 (1981), this Court arrested a judgment based on an indictment that failed to name or identify the defendant in violation of section 15A-924(a)(1). For the rule that a flawed indictment deprived our courts of jurisdiction, Simpson relied on State v. Crabtree , 286 N.C. 541, 212 S.E.2d 103 (1975). See Simpson , 302 N.C. at 616, 276 S.E.2d at 363. But this Court decided Crabtree on 12 March 1975-before the effective date of the Criminal Procedure Act. Ch. 1286, sec. 31, 1973 N.C. Sess. Laws (2d Sess. 1974) at 557 (declaring the effective date of the act as 1 July 1975). In contrast, the facts in Simpson occurred on 3 July 1979. 302 N.C. at 614, 276 S.E.2d at 362. While the Criminal Procedure Act did not apply to the defendant in *805 Crabtree , it did apply in Simpson . So instead of summarily relying on this common law rule, this Court arguably could have analyzed the Criminal Procedure Act to determine whether the common law rule articulated in Crabtree still applied. But it did not.
The cases relied upon by today's majority trace their lineage back to this faulty origin. The majority draws today's rule from State v. Campbell , 368 N.C. 83, 86, 772 S.E.2d 440, 443 (2015), in a quote which finds its origins in Sturdivant , 304 N.C. at 308, 283 S.E.2d at 729. Sturdivant , in turn, drew its rule directly from Simpson and Crabtree .[5] See Sturdivant , 304 N.C. at 308, 283 S.E.2d at 729. Today, the majority perpetuates this obsolescent rule by adding another link to this flawed chain.
**910 Nearly half a century after the passage of the Criminal Procedure Act, this Court continues to apply the common law rule requiring that convictions based on flawed indictments be vacated without determining whether the Criminal Procedure Act abrogated that common law rule. E.g. , State v. Langley , --- N.C. ----, ----, 817 S.E.2d 191, 195 (2018) (relying on the common law rule articulated in State v. McBane , 276 N.C. 60, 65, 170 S.E.2d 913, 916 (1969) ); State v. McGaha , 306 N.C. 699, 702-03, 295 S.E.2d 449, 451 (1982) (relying on the common law rule articulated in State v. Benton , 275 N.C. 378, 381-82, 167 S.E.2d 775, 777-78 (1969), and State v. Coppedge , 244 N.C. 590, 591, 94 S.E.2d 569, 570 (1956) ); cf. State v. Wallace, 351 N.C. 481, 503, 528 S.E.2d 326, 341 (2000) (relying on the common law rule articulated in McGaha and State v. Sellers , 273 N.C. 641, 645, 161 S.E.2d 15, 18 (1968) ). Admittedly, at this juncture, the doctrine of stare decisis may justify this unwillingness to consider this question; however, the failings of the common law jurisdictional rule seem to invite legislative reexamination of this question.
B
A thorough analysis of the Criminal Procedure Act reveals significant evidence that the Act should have displaced the common law jurisdictional rule. "When the General Assembly as the policy making agency of our government legislates with respect to the subject matter of any common law rule, the statute supplants the common law and becomes the law of the State." News & Observer Publ'g Co. v. State ex rel. Starling , 312 N.C. 276, 281, 322 S.E.2d 133, 137 (1984) (citing McMichael v. Proctor , 243 N.C. 479, 483, 91 S.E.2d 231, 234 (1956) ).
The Criminal Procedure Act was a comprehensive overhaul of the rules of criminal procedure in our state. As with all aspects of criminal procedure, the Act thoroughly addresses indictments and other charging instruments, including the form of these documents, the methods of challenging their sufficiency, and the available remedies in the event that these instruments are flawed. Article 49 covers pleadings and joinder in criminal cases. N.C.G.S. ch. 15A, art. 49 (2017). This article provides for the use of pleadings in felony cases, see id. § 15A-923 (2017), and establishes clear expectations about the substance of indictments, see id. § 15A-924. But nothing in Chapter 15A, Article 49 indicates that the requirements of section 15A-924(a) are essential to the jurisdiction of the court.
The majority asserts that the General Assembly "explicitly endorsed" the common law jurisdictional rule by citing to State v. Greer in the official commentary to section 15A-924. See N.C.G.S. § 15A-924 official **911 cmt. (2017). But the official commentary cites Greer only for the proposition that "[t]he pleading rule, requiring factual (but not evidentiary) allegations to support each element, is in accord with traditional ideas." Id. (citing Greer , 238 N.C. 325, 77 S.E.2d 917 ). Far from "explicitly endors[ing]" the common law jurisdictional rule, the commentary cites Greer to clarify the rule that an indictment include "[a] plain and concise factual statement in each count which ... asserts facts supporting every element of a criminal offense." Id. § 15A-924(a)(5). At best, the commentary is silent on the common law jurisdictional rule. *806 In fact, the Criminal Procedure Act provides a separate article solely for jurisdictional rules-Article 2, entitled "Jurisdiction." Article 2 is reserved entirely for future codification. N.C.G.S. ch. 15A, art. 2 (2017). And the official commentary to Article 3 ("Venue") indicates that criminal jurisdiction is presently governed by Chapter 7A of our General Statutes. Id. , ch. 15A, art. 3 official cmt. (2017) (noting that Article 2 is vacant and that "jurisdiction of courts is still primarily covered in Chapter 7A of the General Statutes"). No provision of Chapter 7A mandates that flawed indictments have the effect of depriving the trial court of jurisdiction. See, e.g. , id. § 7A-271 (2017) (setting the boundaries of the superior court's jurisdiction). Our General Statutes thus comprehensively provide for criminal pleadings and criminal jurisdiction-the two subjects of the common law jurisdictional rule. And nowhere has the General Assembly demonstrated any intent to adopt the common law rule. The omission from Articles 2 and 49 of Chapter 15A and from Chapter 7A of any jurisdictional rules concerning indictments therefore indicates that the Criminal Procedure Act probably abrogated the common law jurisdictional rule.
In addition, the statutes establishing remedies for flawed pleadings are not conceptually compatible with a jurisdictional rule for indictments. For example, the Act requires dismissal of charges in a pleading that fails to comply with the requirements of subsection (a). Id. § 15A-924(e). But, as the majority aptly highlights, the statute permits this remedy only "[u]pon motion of a defendant." This does not fit within our typical conception of subject-matter jurisdiction. Contrast this with our rules of civil procedure, which require the court to dismiss an action that has jurisdictional defects-even on its own motion . See N.C. R. Civ. P. 12(h)(3) ; accord Fed. R. Civ. P. 12(h)(3). Similarly, section 15A-955 allows the court to dismiss a case for certain procedural flaws in the grand jury proceedings. But the court may do so only "on motion of the defendant." N.C.G.S. § 15A-955 (2017).
**912 In only one instance does the court have the power to assess, on its own, the validity of the indictment under the current statutory framework. Under Article 29 of the Criminal Procedure Act (entitled "First Appearance Before District Court Judge"), the district court judge is required to examine the charging instrument "and determine whether each charge against the defendant charges a criminal offense within the original jurisdiction of the superior court." Id. § 15A-604(a) (2017). But even if the judge finds the charging instrument flawed, he or she is not required to dismiss the charge. Id. § 15A-604(b) (2017); see also N.C. R. Civ. P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." (emphasis added) ).
The conclusion that the Criminal Procedure Act supplants the common law rule receives further support from provisions regarding motions and appeals. If in fact the General Assembly had intended to leave the common law rule in place, many of these provisions are redundant. "[A] statute should not be interpreted in a manner which would render any of its words superfluous." State v. Coffey , 336 N.C. 412, 417, 444 S.E.2d 431, 434 (1994) (first citing In re Watson , 273 N.C. 629, 634, 161 S.E.2d 1, 6-7 (1968) ; and then citing State v. Cloninger , 83 N.C. App. 529, 531, 350 S.E.2d 895, 897 (1986) ). "We construe each word of a statute to have meaning, where reasonable and consistent with the entire statute, because '[i]t is always presumed that the legislature acted with care and deliberation....' " Id. at 418, 444 S.E.2d at 434 (alterations in original) (quoting State v. Benton , 276 N.C. 641, 658, 174 S.E.2d 793, 804 (1970) ).
When one applies this principle of statutory construction to the Criminal Procedure Act, it becomes even more apparent that the General Assembly did not intend to carry forward the common law jurisdictional rule. Many provisions within the Criminal Procedure Act separate the concepts of jurisdictional flaws and failure to plead-sometimes even in the same sentence. For example, one provision states that "[m]otions concerning jurisdiction of the court or the failure of the pleading to charge an offense may be made at any time." N.C.G.S. § 15A-952(d) (2017)
*807 (emphasis added). Another provision requires the court to dismiss the charges on motion of the defendant if it finds that "[t]he court has no jurisdiction of the offense charged" or "[t]he pleading fails to charge an offense." Id. § 15A-954(a)(8), (10) (2017). And the Act automatically preserves for appeal any errors based upon "[l]ack of jurisdiction of the trial court over the offense of which the defendant was convicted," or if "[t]he pleading fails to state essential elements of an alleged violation, as required by G.S. 15A-924(a)(5)." Id. § 15A-1446(d)(1), (4) (2017). If **913 the General Assembly had intended for the failure to "assert[ ] facts supporting every element of a criminal offense" to deprive the trial court of jurisdiction, as it did under the common law, then these provisions are plainly superfluous.
The Criminal Procedure Act comprehensively overhauled every aspect of our criminal procedure, including indictments and other charging instruments. But nothing in the Act indicates that the failure to comply with the requirements of section 15A-924(a) would flatly deprive the trial court of jurisdiction to hear the case. "The Criminal Procedure Act was 'designed to remove from our law unnecessary technicalities which tend to obstruct justice.' " Jones , 367 N.C. at 313, 758 S.E.2d at 354 (Martin, J., concurring in part and dissenting in part) (quoting Freeman , 314 N.C. at 436, 333 S.E.2d at 746 ). By carrying over the common law rules of indictments, this Court has "engraft[ed] additional unnecessary burdens upon the due administration of justice." Freeman , 314 N.C. at 436, 333 S.E.2d at 746.
C
In addition to undermining a fundamental purpose of the Criminal Procedure Act, the jurisdictional rule flips the entire purpose of grand jury indictments on its head. By treating section 15A-924(a) as a jurisdictional barrier to criminal prosecution in all cases except those charging homicide and certain sex offenses, this Court has given greater protections to littering defendants than to capital defendants.[6]
The technicalities imposed on indictments-and the remedies for the failure to comply with them-emerged in England at a time "when the punishment of crime was so severe as in many cases to shock the moral sense of lawyers, judges and the people generally." Greer , 238 N.C. at 327, 77 S.E.2d at 919 ; Mark Kadish, Behind the Locked Door of an American Grand Jury: Its History, Its Secrecy, and Its Process , 24 Fla. St. U. L. Rev. 1, 6-7 (1997) (noting that defendants accused by early iterations of the grand jury "were tried by ordeal, which forced the suspects to prove their innocence by overcoming the laws of nature"-a process that was "punishing, if not actually fatal"); see generally George J. Edwards, Jr., The Grand Jury: An Essay 4-9 (1906) (discussing the various modes of trial and punishment in use when early iterations of **914 the grand jury emerged in England). Around the time of the American Founding, the English criminal code-later dubbed the "bloody code"-contained approximately 200 capital offenses. Phil Handler, Forging the Agenda: The 1819 Select Committee on the Criminal Laws Revisited , 25 J. Legal Hist. 249, 249 (2004). Many of these capital crimes are treated as low-level felonies today. Compare id. at 251-52 (discussing the sharp increase in executions for forgery in the eighteenth and nineteenth centuries) with N.C.G.S. § 14-119(a) (2017) (classifying forgery generally as a Class I felony).
Grand jury indictments thus arose to protect the lives of defendants. As Blackstone stated:
[F]or so tender is the law of England of the lives of the subjects, that no man can be convicted at the suit of the king of any capital offence , unless by the unanimous voice of twenty-four of his equals and neighbors: that is, by twelve at least of the grand jury, in the first place, assenting to the accusation; and afterwards, by the whole petit jury, of twelve more, finding him guilty upon his trial.
*808 4 William Blackstone, Commentaries *306 (emphasis added); see also John Somers, The Security of Englishmen's Lives 4 (London, Effingham Wilson 1821) (1681) ("For this purpose it is made a fundamental in our government, that, unless it be by parliament, no man's life should be touched for any crime whatsoever, save by the judgment of at least twenty-four men...." (emphasis added) ).
Because we adopted the English common law at the founding, North Carolina's criminal law in some ways reflected the draconian bloody code. The case of State v. Norman discussed above for its distinction between elements and exceptions in indictments, was a prosecution for bigamy in which the defendant had been sentenced to death. See 13 N.C. (2 Dev.) at 227. And other eighteenth and nineteenth century cases reveal a number of capital sentences for stealing horses. See, e.g. , State v. Coulter , 2 N.C. (3, 3 (1791).
In time, the number of capital offenses in our state decreased. With the adoption of the Constitution of 1868, our state limited capital punishment to convictions for murder, arson, burglary, and rape. N.C. Const. of 1868, art. XI, § 2 ("The object of punishments, being not only to satisfy justice, but also to reform the offender, and thus prevent crime, murder, arson, burglary, and rape, and these only, may be punishable with death, if the General Assembly shall so enact."). Today, murder is the only crime punishable by death in our state. See N.C.G.S. § 14-17 (2017).
**915 And yet, murder is one of only a handful of crimes for which the General Assembly has permitted short-form indictments. Id. § 15-144.
Viewed through this lens, the folly of continued application of the common law jurisdictional rule reveals itself. A defendant convicted of first-degree murder and sentenced to die has no recourse where his indictment fails to "assert[ ] facts supporting every element of" capital murder. But a defendant convicted of felony littering and sentenced to a suspended prison sentence and 18 months of probation may appeal the indictment, overturn her conviction, and receive a new trial without ever raising the issue at the trial court.
That runs counter to the purpose and history of grand jury indictments. And it incentivizes conduct at trial that may undermine the proper administration of justice. After all, by continuing to apply this common law rule, we are giving a defendant with a defective indictment a reason to "sandbag." See Wainwright v. Sykes , 433 U.S. 72, 89, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594 (1977). Fully informed of the charges against him, the defendant may proceed to trial hoping for a favorable verdict. If he is found guilty, he may then challenge the indictment on appeal for failing to assert facts supporting an element of the crime. If he is successful, he receives a new trial and a second bite at the apple, even if the facts omitted from the indictment had been uncontestably proven at trial by the prosecution.
This case provides a clear illustration of how the administration of justice can be undermined by operation of the common law jurisdictional rule. Defendant's indictment for felony littering alleges that she "unlawfully, willfully and feloniously did intentionally and recklessly spill and dispose of litter on property not owned by the defendant, the property owned and controlled by the City of Greensboro and not into a litter receptacle.... The litter discarded was hazardous waste." This indictment identified the crime charged, enabled defendant to prepare for trial, and protected her from double jeopardy, thereby satisfying constitutional due process requirements. Cf. Coker , 312 N.C. at 434-35, 323 S.E.2d at 346. Neither defendant nor her attorney challenged the pleading during the two-year period between her indictment and her conviction. And, after her conviction, defendant's initial proposed issues on appeal related to the sufficiency of the evidence-not to the sufficiency of the indictment.
Notably, defendant ultimately raised only one issue on appeal to the Court of Appeals: that the indictment failed to allege that the property where she littered was not "designated ... for the disposal of garbage and refuse." N.C.G.S. § 14-399(a)(1). Defendant did not raise this issue at **916 the trial court, and for good reason. Assuming arguendo that this provision is an essential element of felony *809 littering, its omission did not prejudice her case in any way. The evidence presented at trial showed that she dumped heating fuel in the grass at 709 Elam Avenue in Greensboro and into the street. Defendant could not plausibly argue that the prosecution failed to establish that the land on which she poured heating oil was not publicly designated for that purpose. Had the State been compelled to issue a superseding indictment, its issuance would have had no effect whatsoever on defendant's ability to defend herself or on the trial court proceedings as a whole. The whole exercise would have been nonsensical.
Nevertheless, defendant appealed the omission. And today, defendant succeeds in dumping fuel oil in someone else's yard without consequence, not for the sake of justice, but only because of the rigid technical rules of a bygone era.
III
While the common law jurisdictional rule is outdated, imprudent, and unnecessary, indictment by grand jury still plays a critical role in protecting individual liberty. The grand jury has long been considered "one of the greatest safeguards of the freedom of the citizen." State v. Barker , 107 N.C. 913, 919, 12 S.E. 115, 117 (1890) ; see also In re Russo , 53 F.R.D. 564, 568 (C.D. Cal. 1971) (referring to the grand jury as "a bulwark against ... oppression and despotism"); but see generally Helene E. Schwartz, Demythologizing the Historic Role of the Grand Jury , 10 Am. Crim. L. Rev. 701 (1972) (explaining that "the grand jury's history evidences the vulnerability of that institution to pressure, abuse and manipulation by determined partisans" and exploring famous examples). I do not suggest that the grand jury's role as a protective shield has diminished. But the common law jurisdictional rule, when compared to other approaches, imposes substantial burdens on the judicial system without appreciably advancing those celebrated protections. By discarding the common law jurisdictional rule in favor of plain error review, this Court can protect judicial economy and improve the administration of justice while still safeguarding the rights of criminal defendants.
This Court first adopted the plain error rule in State v. Odom, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983). In Odom , this Court accepted the federal courts' definition of plain error as "fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done." Id. (quoting United States v. McCaskill , 676 F.2d 995, 1002 (4th Cir. 1982) (emphasis omitted) ). "Our decisions have **917 recognized plain error only 'in truly exceptional cases' when 'absent the error the jury probably would have reached a different verdict.' " Dogwood Dev. & Mgmt. Co. v. White Oak Transp. Co. , 362 N.C. 191, 196, 657 S.E.2d 361, 364 (2008) (quoting State v. Walker , 316 N.C. 33, 39, 340 S.E.2d 80, 83 (1986) ). Presently, this Court invokes the plain error rule to review jury instructions and evidentiary issues. Id.
In Cotton , the United States Supreme Court, after rejecting the federal common law jurisdictional rule, applied plain error review to the challenged indictment. 535 U.S. at 631, 122 S.Ct. at 1785. The federal plain error test allows appellate courts to correct "(1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights[,]' ... but only if (4) the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.' " Id. at 631-32, 122 S.Ct. at 1785 (quoting Johnson v. United States , 520 U.S. 461, 467, 117 S.Ct. 1544, 1549, 137 L.Ed.2d 718 (1997) (first and third brackets in original) ). Observing the " 'overwhelming' and 'essentially uncontroverted' " evidence in the record of the element of the offense that was omitted from the indictment, id. at 633, 122 S.Ct. at 1786 (quoting Johnson , 520 U.S. at 470, 117 S.Ct. at 1550 ), the Court held that the failure to include the element in the indictment "did not seriously affect the fairness, integrity, or public reputation of judicial proceedings," id. at 632-33, 122 S.Ct. at 1786.
In the sixteen years since the Supreme Court decided Cotton , "a growing list of states has flatly rejected earlier rulings characterizing the failure to allege all material elements as a jurisdictional defect." State v. Duncan , 505 S.W.3d 480, 489 n.10 (Tenn. 2016) (citing Wayne LaFave et al., *810 5 Crim. Proc. § 19.2(e) (4th ed. 2015) ); see also Ex parte Seymour , 946 So.2d 536, 538 (Ala. 2006) (listing states that reject the common law jurisdictional rule). Many of these states apply plain error review (or some minor variation) when a defendant challenges a defective indictment without objecting before the trial court. E.g. , State v. Maldonado , 223 Ariz. 309, 313, 223 P.3d 653, 657 (2010) (en banc) (applying a "fundamental error" standard); State v. Ortiz , 162 N.H. 585, 590, 34 A.3d 599, 604 (2011) (explaining that the failure to object to the indictment before the trial court "confines our review to plain error"); State v. Schrempp , 2016 S.D. 79, ¶ 13, 887 N.W.2d 744, 748 (2016) (stating that the court "can only review for plain error" when the defendant fails to raise a timely objection to the indictment). And in at least one state retaining the jurisdictional rule, "defects 'which are tardily challenged are liberally construed in favor of validity.' " State v. Jones , 140 Idaho 755, 759, 101 P.3d 699, 703 (2004) (quoting State v. Cahoon , 116 Idaho 399, 400, 775 P.2d 1241, 1242 (1989) ). **918 Applying our own plain error rule in cases in which the defendant failed to object to a defective indictment at trial would lead to better outcomes by properly aligning defendants' incentives with the aims of justice. After all, one serious threat to the "fairness, integrity, and public reputation of judicial proceedings" arises when defendants, despite "overwhelming and uncontroverted evidence," avoid punishment for crimes because of "error[s] that w[ere] never objected to at trial." Cotton , 535 U.S. at 634, 122 S.Ct. at 1787 (citing Johnson , 520 U.S. at 470, 117 S.Ct. at 1550 ).
But our state has seen this unpalatable scenario play out repeatedly through the application of the common law jurisdictional rule. For example, in State v. Murrell , this Court affirmed a Court of Appeals decision to vacate a conviction for robbery with a dangerous weapon. 370 N.C. 187, 197, 804 S.E.2d 504, 511 (2017). In Murrell , the defendant robbed a bank by handing the teller a note demanding cash and informing the teller that he was armed. Id. at 188, 804 S.E.2d at 505. After his arrest, the defendant admitted to the robbery and told police that he had a weapon in his possession during the robbery. Id. at 190, 804 S.E.2d at 506. The indictment charging the defendant with robbery with a dangerous weapon alleged that he committed the robbery "by way of it reasonably appearing to the victim ... that a dangerous weapon was in the defendant's possession." Id. The defendant was convicted, and he appealed his conviction on the grounds that the indictment was defective-an issue he failed to raise before the trial court. See id. The Court of Appeals arrested the judgment, holding that the indictment "failed to name any dangerous weapon that defendant allegedly employed." Id. at 191, 804 S.E.2d at 507. This Court affirmed that holding. Id. at 197, 804 S.E.2d at 511. Thus, despite the threatening note and the defendant's admission to having a pistol at the time of the robbery, the defendant's armed robbery conviction was vacated.
Murrell is hardly an outlier. Indeed, there is no shortage of convictions in North Carolina that were vacated due to a technical deficiency in an indictment that was not challenged before conviction and that had no bearing on the fairness, integrity, or public reputation of judicial proceedings. See, e.g. , State v. Randall , 228 N.C. App. 282, 748 S.E.2d 775, 2013 WL 3356878 (2013) (unpublished) (vacating a conviction for being a registered sex offender unlawfully on the premises of an elementary school because the indictment failed to specify what his previous offense was or indicate that it involved a victim under the age of sixteen); State v. Harris , 219 N.C. App. 590, 597, 724 S.E.2d 633, 638-39 (2012) (same). In State v. Wynn , the Court of Appeals vacated a conviction for trafficking **919 in cocaine by sale. 204 N.C. App. 371, 696 S.E.2d 203, 2010 WL 2163766, at *3 (2010) (unpublished). Evidence presented to the trial court in that case showed that, through video and audio surveillance, police witnessed the defendant selling cocaine to a confidential informant. Id. at *1. Almost immediately after the sale, police surrounded the defendant and searched his vehicle. Id. Inside the vehicle, police found cocaine, crack cocaine, cash, digital scales with white powder residue, and a cell phone. Id. At trial, the defendant did not object to the sufficiency of the indictment, choosing instead to raise that *811 issue for the first time when appealing his conviction. Id. at *2. Despite the overwhelming evidence of the sale presented at trial, the Court of Appeals vacated the defendant's conviction for trafficking in cocaine by sale because the indictment failed to allege "the name of the individual to whom Defendant allegedly sold the cocaine," even though the State knew the name of that person. Id. at *3 ; see also State v. Calvino , 179 N.C. App. 219, 221-22, 632 S.E.2d 839, 842 (2006) (vacating a conviction for sale and delivery of cocaine on similar grounds).
These decisions clearly illustrate the shortcomings of the common law jurisdictional rule. Compared with alternative approaches to reviewing flawed indictments, as utilized in federal court and the courts of other states, the common law jurisdictional rule unnecessarily hinders the proper administration of justice. This Court can-and should-reconsider its rigid adherence to this archaic rule. Alternatively, I respectfully request that the General Assembly reexamine a rule that perpetuates misaligned incentives and undermines the criminal justice system.
* * *
In summary, the majority opinion misconstrues and mischaracterizes N.C.G.S. § 14-399 to discover an essential element of littering that the text of the statute does not contain to correct an injustice that does not exist. In so doing, the majority engages in an amorphous "holistic inquiry" instead of providing lower courts and practitioners with a meaningful standard for distinguishing elements from affirmative defenses. More fundamentally, the Court misses an opportunity to reevaluate an obsolete rule that detrimentally impacts the administration of justice in our State. I therefore respectfully dissent.
Justice NEWBY joins in this dissenting opinion.

The defendant was charged by use of a warrant rather than an indictment because the charged crime was a misdemeanor. See Moore , 166 N.C. at 286, 81 S.E. at 295. This distinction does not affect the analysis of whether a proviso is an exception or a qualification for the purpose of a charging instrument, though. See id. at 288-89, 81 S.E. at 296 (stating that "[c]riminal accusations, whether in the form of warrants or indictments , must" meet certain requirements (emphasis added) ).

This outlandish illustration highlights the real absurdity in this case: the majority's lack of confidence in the men and women serving as grand jurors in our criminal justice system. Despite the majority's dystopian predictions, I find it hard to imagine that a grand jury anywhere in our State would indict hapless bus drivers, sanitation workers, or other hard-working citizens for simply doing their jobs.

Given the significant import of this question of law to North Carolina criminal procedure, this Court should request supplemental briefing. So, to be clear, I am not suggesting that we rule on this question without input from the parties.

At least one commentator has argued that the rule permitting waiver of indictments at the federal level is unconstitutional. See generally Roger A. Fairfax, Jr., The Jurisdictional Heritage of the Grand Jury Clause , 91 Minn. L. Rev. 398, 430-48 (2006) (describing the friction between the United States Constitution and reformers' desire to circumvent the grand jury requirement). Whatever constitutional deficiencies may or may not plague the federal rule permitting waiver, the adoption of a constitutional amendment in our state removes any such questions concerning waiver.

The majority also relies on State v. Wagner , 356 N.C. 599, 601, 572 S.E.2d 777, 779 (2002) (per curiam). Wagner cites directly to State v. Vestal , 281 N.C. 517, 520, 189 S.E.2d 152, 155 (1972), another case that predates the Criminal Procedure Act.

Admittedly, the General Assembly relaxed the requirements for a murder indictment, relative to most other felonies, in the nineteenth century. See N.C.G.S. § 15-144. But as this section discusses, while the original motivation for the common law jurisdictional rule was to protect defendants in capital cases, it now protects everyone but defendants in capital cases.